Jerome L. ARRINGTON, Appellant,

v.

UNITED STATES, Appellee.

Nos. 97–CF–1219, 99–CO–381, 01–CO–811.

District of Columbia Court of Appeals.

Argued June 27, 2002.
Decided Aug. 15, 2002.

Kenneth E. Sealls, Washington, DC, appointed by the Court, for appellant.

Joseph W. Clark, Assistant United States Attorney, with whom Roscoe C. Howard, Jr., United States Attorney, and John R. Fisher and Joan Draper, Assistant United States Attorneys, were on the brief, for appellee.

Before SCHWELB, FARRELL, and GLICKMAN, Associate Judges.

SCHWELB, Associate Judge:

Jerome L. Arrington was convicted by a jury of one count each of kidnaping while armed,[1] armed robbery,[2] assault with intent to commit rape while armed,[3] and possession of a firearm during a crime of violence.[4] Arrington subsequently filed a number of post-trial motions, each of which was denied. Arrington noted timely appeals from his convictions and from the denial of two of his post-trial motions. We conclude that the denial of the two motions, especially when the two are considered together, requires reversal. We therefore vacate the orders denying the

---

1. D.C.Code §§ 22–2101,–3202 (1981), since recodified in §§ 22–2001,–4502 (2001).

2. D.C.Code §§ 22–2901,–3202 (1981), since recodified in §§ 22–2801,–4502 (2001).

3. D.C.Code §§ 22–501,–3202 (1981), since recodified in §§ 22–501,–4502 (2001).

4. D.C.Code § 22–3204(b) (1981), since recodified in §§ 22–4504,–4502 (2001).

two motions and remand the case for further proceedings consistent with this opinion.

## I.

## THE EVIDENCE

At Arrington's trial, the prosecution presented evidence that on the morning of February 27, 1994, Deon Moore and Tonya Gray had just returned to the apartment building in which Ms. Moore lived when they were approached by a man who was carrying a double-barreled shotgun. Using abusive language, the armed man forced the women into the basement, where the assailant was joined by a second man. The assailant demanded the women's money and took $190 from Ms. Moore, who had recently cashed a welfare check. The robber then ordered both women to pull down their pants; terrified, the women complied. The robber pulled out his penis, and Ms. Moore began to scream. The man shouted at Ms. Moore: "Bitch, you are gonna fuck me or you're gonna suck my dick." At this point the second man warned the robber that he (the confederate) would not permit the women to be raped. In response, the robber pointed the shotgun at the second man. Subsequently, however, the robber relented and let the women leave, warning them not to report what had occurred and telling them to forget his face.

After a brief delay, and at the direction of her social worker, Bernice Muskelly, Ms. Moore reported the incident to the police. She described her attacker as a short, dark-complexioned man with pink lips and a missing tooth. She reported that the robber's confederate had called the robber "Tyrone" or "Jerome." Ms. Moore indicated that she had seen her assailant in the neighborhood prior to the robbery, but she was not otherwise acquainted with him.

Three days after reporting the robbery to the police, Ms. Moore saw a man she believed to be the robber coming out of an apartment across from her own apartment. She immediately advised Ms. Muskelly, who telephoned the police, and officers promptly apprehended the suspect. Ms. Moore identified the suspect as her assailant. The man turned out to be Jerome L. Arrington, the appellant in this case.

Arrington did not take the stand at his trial, which was before Judge Gladys Kessler, and he presented no witnesses.[5] Arrington was convicted of all charges. He filed a timely notice of appeal, and his direct appeal (No. 97–CF–1219) remains pending and is presently before us.

Following his conviction, Arrington filed a number of post-trial motions attacking his trial and sentence. These motions included one filed on March 3, 1998, pursuant to D.C.Code § 23–110 (1981), in which Arrington asserted that his trial counsel was constitutionally ineffective because he failed to interview or call allegedly exculpatory witnesses. On February 28, 1999, following an evidentiary hearing at which Arrington was not present, the motion was denied by Judge Henry F. Greene in a written order. Arrington noted a timely appeal from this order (No. 99–CO–381).

On July 24, 2000, Arrington filed a *pro se* motion purportedly pursuant to D.C.Code § 23–110. In substance, however, Arrington sought a new trial on the basis of newly discovered evidence, and the government agrees that the motion should be treated as one pursuant to Super. Ct.Crim. R. 33. This motion was denied on December 22, 2000, by Judge Patricia A. Wynn in a written order. Arrington again noted a timely appeal (No.

---

5. Margaret (Margie) Parker, whom Arrington's counsel proposed to call as a witness, invoked her privilege against self-incrimination and refused to testify.

01–CO–811). The three appeals were consolidated by order of this court and are now before us.[6]

## II.

### THE MOTION BASED ON THE ALLEGEDLY INEFFECTIVE ASSISTANCE OF COUNSEL

A. *Background.*

In his motion seeking a new trial on the basis of ineffective assistance of trial counsel, Arrington asserted that his attorney had failed to interview and call potential defense witnesses who would have contradicted Ms. Moore's testimony that Arrington was essentially a stranger to her. Arrington's motion was accompanied, *inter alia,* by affidavits by Andre Dudley, Norman Hendrickson, and Arrington himself. The gravamen of the motion was that counsel's failure to interview and call Dudley and Hendrickson left unchallenged an essential part of the prosecution's case, namely, that Ms. Moore was an innocent individual who was assaulted by and robbed by a stranger. If the jury could be persuaded that Arrington and Ms. Moore were crack-smoking associates and that Ms. Moore lied about this association, then, in Arrington's view, her credibility would be shattered.

According to his affidavit filed in support of Arrington's motion, Andre Dudley had been advised that Ms. Deon Moore had testified at Arrington's trial, and that she had claimed "that she had no prior acquaintance or association with Mr. Je-

rome Arrington." Dudley asserted in his affidavit, *inter alia,* that if Ms. Deon Moore had indeed so testified, she had "[c]ategorically lied under oath." Dudley stated that he, Ms. Deon Moore, and Mr. Jerome Arrington "often associated, and during that association used [c]ocaine for our personal enjoyment or habit." In other words, according to Dudley, Arrington and Ms. Moore were his cocaine-smoking buddies and, contrary to Ms. Moore's testimony, were not strangers to one another at all.

Norman Hendrickson essentially corroborated Dudley's account. Hendrickson stated in his affidavit that he had been acquainted with Ms. Deon Moore and Mr. Jerome Arrington "over a period of [m]onths." Hendrickson continued as follows:

> During this association, the affiant observed Ms. Deon Moore, and Mr. Jerome Arrington together smoking [c]rack [c]ocaine. Further, [a]fter being an eye-witness to this association, the affiant indulged in the smoking of [c]rack cocaine with Ms. Deon Moore and Mr. Jerome Arrington, during the [m]onth of November 1993.

Arrington swore in his affidavit that he had provided his trial counsel with the names and addresses of the following witnesses well in advance of trial:

Jamel Norris (now deceased)

Andre Dudley

Norman Hendrickson

Margie Parker.[7]

---

**6.** The history of this case is complex and includes a number of other post-trial motions. We address only those relevant to our disposition.

**7.** The affidavits of trial counsel and his investigator reveal that both Ms. Norris and Ms. Parker were interviewed and were actually present at Arrington's trial. Counsel declined to call Ms. Norris because she had no useful information. Ms. Parker invoked her privi-

lege against self-incrimination and declined to testify. Nevertheless, Ms. Parker provided an affidavit in support of Arrington's post-trial motion in which she related that, on the night of the robbery, she "saw Jerome Arrington leave Deon Moore['s] apt. and cross the hall to my apt. where he was for the next two days." Ms. Parker also stated that "[m]e and Deon Moore have also been in the Community buying drugs around each other many times."

The record thus contains an assertion, under oath, that the identities of both Dudley and Hendrickson were known to Arrington's attorney prior to the trial.

The government responded to Arrington's motion with an affidavit and a supplemental affidavit by Arrington's trial attorney and an affidavit by counsel's investigator. The investigator related in his affidavit that he had interviewed Arrington at the outset of the investigation about potential witnesses, and that Arrington had never mentioned Andre Dudley or Norman Hendrickson to him. The investigator related, however, that he had "located one person ... named 'Norman' who. had no information about the case but who did take me to the location of the offense and assisted me in locating people who tried, to no avail, to help me find Mousey."[8] Arrington's trial attorney made no mention of Dudley or Hendrickson either in his affidavit or in his supplemental affidavit. The attorney ultimately produced his own notes of his discussions with Arrington; these notes did not mention Dudley or Hendrickson.

On November 20, 1998, Judge Henry F. Greene conducted a hearing on Arrington's claim of ineffective assistance of counsel. Judge Greene acknowledged that Arrington, who was serving his sentence at a penal institution in Ohio, had requested to be present at the hearing. The judge ruled, however, that Arrington's presence was not required in order to dispose of the motion.

The only witness at the hearing was Arrington's trial counsel, who was examined by the prosecutor and by Arrington's present attorney.[9] At the hearing, trial counsel produced a memorandum from Arrington giving Arrington's version of the relevant events, but he made no mention of Dudley or Hendrickson. Arrington's present counsel protested that Arrington should have been permitted to be present in order to explain and counter the memorandum produced by his trial counsel, and he requested a continuance. At the conclusion of the hearing, Judge Greene stated:

I'm going to examine the exhibits and the notes in this case and I'm going to do one of two things. I'm going to either resolve this matter on the record that we have at this point or set a further date when we can have Mr. Arrington here.

On February 28, 1999, the judge issued a written order in which he denied Arrington's § 23–110 motion. The judge explicitly found, *inter alia,* that Arrington never advised his attorney regarding Andre Dudley and Norman Hendrickson. The judge "credit[ed] the testimony of defendant's trial counsel ... supported by notes written to him by the defendant prior to defendant's trial." The judge made this finding without hearing testimony from Arrington, who had provided an affidavit in which he had sworn to facts that were contrary to the judge's credibility finding. The judge

8. It is unclear whether or not "Norman" was Norman Hendrickson. As previously noted, Norman Hendrickson did not purport to know anything about the robbery itself, but he claimed to be familiar with the drug-based relationship between Arrington and Ms. Moore. As to "Mousey," see Part III of this opinion, *infra.*

9. Trial counsel gave no specific mention in his testimony as to whether Arrington had told him of Dudley or Hendrickson. He stated that he did not recall Arrington providing names not mentioned in his (counsel's) notes, but noted that "there was conversation about other people but a lot of that was more focused on what Mr. Arrington may have transacted with my investigator." The investigator did not testify at the hearing.

thus rejected Arrington's statement, made under oath, without observing Arrington testify and without being able to assess Arrington's demeanor.

### B. Analysis.

■■■ In order to establish that his trial counsel was constitutionally ineffective, Arrington must demonstrate both deficient performance and prejudice. *Strickland v. Washington*, 466 U.S. 668, 687–94, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Failure to call exculpatory witnesses may constitute deficient performance. *Byrd v. United States*, 614 A.2d 25, 30–31 (D.C.1992). In this case, if Dudley and Hendrickson had testified, and if the judge had credited their testimony, they could have significantly damaged the prosecution's case.[10] Ms. Moore's credibility might have been seriously undermined if the trier of fact had determined that Arrington was not a stranger, as Ms. Moore had testified, but rather a close associate with whom she abused crack cocaine. A great deal therefore turned on whether or not Arrington had, as he claimed, provided the names and addresses of Dudley and Hendrickson to his counsel in advance of trial.

In deciding that, contrary to Arrington's affidavit, Arrington had *not* provided these names to his attorney, the motions judge was, as he himself recognized, making what was essentially a credibility determination. He did so without hearing testimony from anyone who had any direct knowledge regarding this disputed fact. The trial attorney never denied (or admitted) that Arrington had provided these names. The investigator did not testify. Arrington was not permitted to be present.

It is true that neither Dudley nor Hendrickson was mentioned in trial counsel's notes or in Arrington's memorandum. But the notes were hardly conclusive; trial counsel acknowledged that other names were mentioned during the course of the investigation. Arrington's memorandum was primarily a narrative of what occurred; it did not touch on information about witnesses who knew of the alleged prior association between Arrington and Ms. Moore. Moreover, Arrington was never given an opportunity to explain his memorandum or the omission therefrom of any mention of the two potential witnesses.

We conclude that it is impossible to determine from this record whether Arrington's allegations of ineffective assistance have merit without a more searching exploration, including live testimony, of the question whether Arrington provided information about Dudley or Hendrickson to his counsel in advance of trial. Arrington should have been permitted to testify as to this issue, and we conclude that it was error to make the dispositive credibility determination without his evidence. Accordingly, we vacate the order denying Arrington's § 23–110 motion and remand the matter for an evidentiary hearing.[11]

---

10. Having said this, we of course do not decide whether the proffered evidence would have met the second prong of the *Strickland* test, an inquiry that must await the remand.

11. D.C.Code § 23–110(d) provides that "[a] court may entertain and determine [a § 23–110] motion without requiring the production of the prisoner at the hearing." "Not every colorable allegation entitles a ... prisoner to a trip to the sentencing court." *Sanders v. United States*, 373 U.S. 1, 20, 83 S.Ct. 1068, 10 L.Ed.2d 148 (1963); *see also Machibroda v. United States*, 368 U.S. 487, 495, 82 S.Ct. 510, 7 L.Ed.2d 473 (1962). In this case, however, we conclude that the defendant's presence was required in order to assure the fair and effective resolution of a potentially dispositive issue of fact.

## III.

## THE MOTION BASED ON THE MURRAY AFFIDAVIT

### A. *Background.*

■ In support of his motion for a new trial based on newly discovered evidence, Arrington filed two handwritten affidavits, one executed by Arrington himself and the second executed by Andre C. (Mousey) Murray. Arrington alleged in his affidavit that he had encountered Murray at Lorton in 1994 or 1995, and that at that time Murray had "spoke[n] of this crime" and had told Arrington that "that's what [Arrington] g[o]t" for "staying with them Bitches getting high [and] giving all your shit away." Arrington claimed that he attempted to pursue this information, but that he had been unable to remain in touch with Murray. Arrington related that in approximately January 2000, he ran into Murray again at a prison infirmary, and that Murray was then belatedly prepared to disclose what he knew of the case, including Murray's own involvement in it.

Murray stated in his affidavit that in 1994, he, Arrington, Ms. Moore and Ms. Gray, together with several other individuals, were all members of a "crack smoking club." Murray indicated that there had been tension between Arrington and Ms. Moore and that Ms. Moore had stolen some drugs and money. On February 28, 1994, according to Murray,

> myself and two (2) non-members [of the crack-smoking club] was "getting high" in the hallway of Ms. Moore[']s] apt. bld. and that's when we encountered Ms. Moore and Ms. Gray entering the doorway. Non-member No. # one (1) suddenly pulled out a phony (toy) shotgun (this object is right today hidden in the basement of bld. 1414 1st St., S.W.[,] D.C. under some bricks) and insisted that money be given to him. In the interim, participant No. # three (3)

closed the ... door and guarded it so no one could enter. When *no* monies was produce[d] by either victim[,] participant No. # one (1) suggested that *we* take the young ladies to the basement for a *shakedown.* Remembering what Ms. Moore did to me and club members, I agreed. Once the complain[ ]ant and her girlfriend was searched Ms. Moore immediately stated, "Mousey, don't let that guy do anything to me." After watching Ms. Moore tearfully cry, plead for freedom, I immediately turned my attention to participant No. # one (1) and told him that if he assault[ed] or even touch[ed] Ms. Moore or Ms. Gray that I would kill him. Soon after, I told Ms. Moore and her girlfriend to leave and that they should stop *"playing"* on men and tricking them out of their monies.

The government filed an opposition to Arrington's motion, contending solely that the motion was "procedurally barred." Noting that "the nature of a motion is determined by the relief sought, not by its label or caption" (citing *Diamen v. United States,* 725 A.2d 501, 507 (D.C.1999)), the government argued that "the time constraints applicable to motions based on newly discovered evidence may not be circumvented by 'merely designating this a § 23–110 motion'" (citing *Diamen, supra;* internal brackets omitted). The government asserted that Arrington's motion was based on newly discovered evidence, that it was therefore cognizable only under Super. Ct.Crim. R. 33, that "the time limitations of Rule 33 are jurisdictional," *Diamen, supra,* 725 A.2d at 506, and that the motion was untimely because it had not been filed within three years after verdict, as purportedly required by Rule 33.

Arrington's motion was denied in a written order signed by Judge Patricia A. Wynn on December 22, 2000, and docketed

five days later. Judge Wynn held that the motion was untimely because, according to the judge, it was not filed within two years of "final judgment." The judge further expressed the view that the evidence was not "newly discovered" because "[t]he defendant claims that he discovered this evidence ... five or six years before the filing of his instant motion." The judge also believed that the evidence was "not of such a nature that acquittal would likely result from its use" (citation omitted), because, in her view, Murray's claims were inconsistent with the identification testimony presented by the prosecutor at Arrington's trial. Finally, the judge noted that this was Arrington's second motion pursuant to § 23–110, and that the court was not required "to entertain a second or successive motion for similar relief on behalf of the same prisoner." § 23–110(e).

### B. *Analysis.*

As noted above, the government opposed Arrington's motion in the trial court solely upon the ground that the motion was untimely under Rule 33 and that the court therefore lacked jurisdiction to entertain the motion. The trial judge expressed her agreement with the government's contention that the motion was untimely. The government has now abandoned the position that it took in the trial court, and the judge's ruling cannot be sustained.

■ At the time Arrington was convicted, a defendant was permitted to file a motion for a new trial based on newly discovered evidence at any time up to two years after the date of final judgment. *See* Super. Ct.Crim. R. 33 (1991). A

judgment of conviction did not become final for purposes of Rule 33 until the appellate process had been completed and the appellate court's mandate had issued. *See, e.g., United States v. Cook,* 705 F.2d 350, 351 (9th Cir.1983).[12] At the time Arrington's motion was filed, his direct appeal was still pending, and "final judgment" within the meaning of Rule 33 had not yet been entered.

Rule 33 was amended, effective June 22, 1999, to provide that a defendant shall have until three years *after the verdict or finding of guilt* to file such a motion. Super. Ct.Crim. R. 33 (2001) (emphasis added). It is, at least, questionable, whether the new rule may be applied retroactively to render untimely a motion which would have been timely under the old rule, and the government does not contend in this court that the new rule may be so applied. Rather, the government "assume[s] for the purposes of this brief that [Arrington's] case is governed by the old rule *and that his motion for a new trial was timely.*" (Emphasis added.) The government has thus effectively conceded the unsoundness of the only ground upon which it had opposed Arrington's motion before Judge Wynn. Given the "assumption" on which the government is litigating this appeal, we conclude for purposes of this case that Arrington's motion was timely.

The trial court's remaining reasons for denying the motion without an evidentiary hearing were not asserted by the government in the trial court, and we do not find them persuasive. Contrary to an observation in the judge's written order, Arrington did not claim that he discovered the evi-

---

**12.** "Under Rule 33, 'final judgment' is defined as the date on which the appellate process 'is terminated.' The appellate process is terminated—and thus the two year period begins to run—when an appellate court issues its mandate of affirmance." *Cook, supra,* 705 F.2d at 351 (citations omitted). In holding that Ar-

rington's motion was not filed within two years of "final judgment," the trial court apparently failed to appreciate the significance of the fact that Arrington's appeal remained pending and that no final judgment had been entered.

dence five or six years before filing the motion. According to Arrington's affidavit, Murray made certain remarks about the case in 1994. These remarks, however, were hardly a model of clarity, and they would not have provided Arrington with grounds for a Rule 33 motion. Subsequently, according to his affidavit, Arrington lost contact with Murray for several years, and it was not until the year 2000 that Murray provided the information on which Arrington's motion was ultimately based.

The judge was also of the opinion that the proffered evidence was not likely to lead to an acquittal. The judge so ruled because, according to her, Murray's affidavit was contrary to the prosecution's evidence at trial.[13] In our view, however, this ground for the judge's ruling is too broad to be tenable; newly discovered evidence proffered by a defendant is, by its very nature, contrary to the testimony that led to his conviction. If a motion for a new trial based on newly discovered evidence could properly be denied solely because the proffered evidence contradicts prosecution testimony, then the safety valve provided by Rule 33 would be altogether ineffective.

In the present case, in particular, an evidentiary hearing to assess Murray's credibility would have been appropriate.

Murray's affidavit included an admission of criminal conduct on his own part, and thus had at least some arguable potential for enhanced credibility.[14] Moreover, Murray's statement regarding the location of the "phony toy shotgun" could readily have been proved true or false as one indication of his credibility or lack thereof.[15]

In its brief in this court, the government argues, somewhat curiously, that

> Murray's affidavit does not exonerate appellant. Murray admits [that] he and two other persons robbed Deon Moore but Murray never squarely states that appellant was not involved.

This contention cannot be squared with the record. In his affidavit, Murray unequivocally stated that the robbery was committed by "myself and *two (2) non-members*" of the "Crack Smoking Club." Murray further explicitly identified Jerome Arrington as one of the members of that club. By a simple process of elimination, Murray's affidavit made it clear that, according to Murray, Arrington was not a participant in the robbery. Moreover, Murray began his affidavit as follows: "This Pro Se Affidavit is in support of Mr. Jerome Arrington's Claim[s] of Non Participation."

■ Judge Wynn was quite correct in her observation that the trial court is not required to entertain successive motions

---

**13.** In order to be entitled to a new trial based on newly discovered evidence, the defendant must show that (1) the evidence proffered is newly discovered; (2) the moving party must show diligence in his efforts to obtain the new evidence; (3) the evidence must not be merely cumulative or impeaching; (4) it must be material to the issues involved; and (5) it must be of such a nature that an acquittal would likely result from its use. *Herbin v. United States*, 683 A.2d 437, 441 (D.C.1996) (citing *Byers v. United States*, 649 A.2d 279, 287 (D.C.1994)).

**14.** The confession of Joe Dick ... that he committed the murder for which the plaintiff

in error was tried, coupled with circumstances pointing to its truth, would have a very strong tendency to make anyone outside of a court of justice believe that Donnelly did not commit the crime.

*Donnelly v. United States*, 228 U.S. 243, 277, 33 S.Ct. 449, 57 L.Ed. 820 (1913) (Holmes, J., joined by Hughes, J., and Lurton, J., dissenting).

**15.** The parties have not revealed to the court whether Murray's "clue" was explored by the police or by counsel and, if so, what the results were of such exploration.

for collateral relief on behalf of the same prisoner. *See* D.C.Code § 23–110(e). There are, however, circumstances in which it serves the interests of justice to consider a new motion containing significant and potentially exculpatory information not previously available to the defendant. *Cf. Dantzler v. United States,* 696 A.2d 1349, 1355–56 (D.C.1997). In the present case, several of the factors set forth in *Herbin, supra, e.g.,* whether the proffered evidence was newly discovered, whether Arrington exercised diligence in his pursuit of the evidence, and whether the evidence was likely to lead to Arrington's acquittal, could be illuminated by an evidentiary hearing. We therefore vacate the decision in No. 01–CO–811 and remand for such a hearing.

### IV.

### CONCLUSION

We find no error in No. 97–CF–1219.[16] The orders on appeal in Nos. 99–CO–381 and 01–CO–811 are vacated, and the case is remanded for an evidentiary hearing on each motion.

*So ordered.*

---

**16.** In his direct appeal, Arrington asserts that the trial court erred by imposing a mandatory minimum sentence for armed offenses based on D.C.Code § 22–3202(a)(1) (1981) because, according to Arrington, the prosecution did not prove that the shotgun allegedly used by Arrington was operable. The government responds that the issue is moot and that, in any event, the prosecution was not required to prove operability. We do not reach these questions because this court has held that just as it would be reasonable for a robbery victim to assume that a pistol directed at him in a menacing manner is loaded and operable, so too "the factfinder could fairly infer that the [gun was] both loaded and operable." *Morri-*

*son v. United States,* 417 A.2d 409, 413 (D.C. 1980); *accord, Bartley v. United States,* 530 A.2d 692, 698 (D.C.1987) ("[j]ust as it would have been reasonable for the Saferight employees to believe that appellants' weapons were operable, so too it would be reasonable for the jury to conclude likewise") (*citing Morrison, supra,* 417 A.2d at 413). Notwithstanding the significant question raised by the dissenting opinion in *Morrison,* 417 A.2d at 413, *Morrison* and *Bartley* are binding on us under the doctrine of *M.A.P. v. Ryan,* 285 A.2d 310, 312 (D.C.1971). We note, though, that Murray referred to the weapon as a "toy gun."