Marthell N. DEAN, Appellant

v.

UNITED STATES, Appellee.

Nos. 98–CF–851, 04–CO–186.

District of Columbia Court of Appeals.

Argued June 14, 2005.

Decided Dec. 28, 2007.

Ryan D. Nelson, with whom Jeffrey T. Green, Washington, DC, was on the brief, for appellant.

Elizabeth H. Danello, Assistant United States Attorney, with whom Kenneth L. Wainstein, United States Attorney at the

time the brief was filed, John R. Fisher, Assistant United States Attorney at the time the brief was filed, June M. Jeffries, and Frederick W. Yette, Assistant United States Attorneys, were on the brief, for appellee.

Before WASHINGTON, Chief Judge,* RUIZ, Associate Judge, and KING, Senior Judge.

RUIZ, Associate Judge:

Appellant was convicted of murdering a member of the Metropolitan Police Department. On appeal, he contends that the statute providing for mandatory life imprisonment without the possibility of parole for the murder of a law enforcement officer, D.C.Code § 22–2406 (1995 Supp.), unconstitutionally violates the guarantee of equal protection under the laws; that the trial court should have suppressed the confession which was introduced at trial because he did not validly waive his *Miranda*[1] rights; and that the trial court improperly coerced a deadlocked jury to render a verdict. He also appeals the denial of his subsequent motion for a new trial under Criminal Rule 33, arguing that the trial court erred both in finding that it lacked jurisdiction over the motion and in denying the motion on the merits. We affirm in both appeals.

## I.

Shortly after 3:00 a.m. on February 5, 1997, Officer Brian Gibson—a decorated officer of the Metropolitan Police Department (MPD) who was on routine patrol in full uniform and in a marked police cruiser—was murdered by an assailant who shot him four times at point-blank range while his patrol car was stopped at a red light at the intersection of Georgia and Missouri Avenues, Northwest.

According to testimony presented at trial, earlier that evening, appellant met with several friends who were celebrating the birthday of one of their group, drinking champagne and Remy Martin cognac. One of the group, Kevin Curtis, had seen appellant with a .45-caliber automatic handgun earlier that evening.[2] The group of friends later made their way to the Ibex nightclub, which had a local reputation for often hosting loud and violent parties,[3] where appellant continued to drink champagne. According to the testimony of several eyewitnesses, appellant and others got into an altercation with another group at the club. By all accounts, appellant was "[w]ild," and "jumping around." Before the two groups came to blows, an off-duty officer in MPD uniform,[4] intervened and momentarily was able to keep the situation from escalating into violence. However, within two minutes, appellant was again

---

* Chief Judge Washington was an Associate Judge of the court at the time of argument. He became Chief Judge on August 6, 2005.

1. *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

2. Curtis made this statement in his testimony to the grand jury, but at the trial he claimed that he had lied in front of the grand jury in response to police pressure. His prior testimony was admitted at trial as substantive evidence, *see* D.C.Code § 14–102(b) (1981), and appellant has not challenged its admission.

3. Violent events at this nightclub have been mentioned in at least one other reported decision of this court. *See Gibson v. United States,* 792 A.2d 1059, 1061–62 (D.C.2002). Evidence was presented at trial that, within days after Officer Gibson's murder, and because of local pressure, the club's liquor license was revoked. *See The Ibex Shutdown,* Wash. Post, Feb. 8, 1997, at A20.

4. Testimony at trial established that regulations in effect at the time of this crime required that MPD officers who were moonlighting as security officers do so in uniform.

"trying to get at this other group," and "acting out of control, real wild." Thus, Ibex's employees decided to eject appellant from the club, and he was led by a uniformed police officer to a third-floor exit, and, on his own, appellant then went down the external steps to the street below.

Juan Wilson, a member of the group that had gone to the Ibex club and a friend of appellant, testified that he went outside to check on appellant after he had been ejected from the nightclub. He found appellant armed with a hand gun, running north on Georgia Avenue. Wilson testified that he went to a public telephone to call appellant's sister and, looking back, saw appellant kneeling between two parked cars "getting the gun together." As Wilson turned toward the phone to make the call, he heard gunshots, and ran away. Wilson was heavily impeached at trial: he conceded on cross-examination that he had previously told people that appellant had not been the shooter, and a witness testified that Wilson had told her that appellant was not the shooter, but he (Wilson) was blaming appellant for the murder only "because [the police] was [sic] telling him that [appellant] said that he did it." Another witness testified that he had heard Wilson acknowledge that "they know that he did it and someone is going to testify against him and he was waiting for somebody to pick him up." Additionally, Wilson's former employer was called as a defense witness to show that Wilson had lied about whether he had been employed at the time of the shooting.

When shots rang out minutes after appellant was kicked out of the club, police in the vicinity immediately responded. They found Officer Gibson dying. Three witnesses—Steven Bly, Aaron Bly and Sharwana Williams—saw the shooting. They looked back and saw someone at the driver's side of a police car. Although they could not see the shooter's face, Williams and Aaron Bly described him as a man wearing a dark shirt or black jacket with white stripes on the sleeves. All three witnesses saw this man walk north on Georgia Avenue after the shooting. An autopsy revealed that Officer Gibson had been shot four times from a range of two to twenty inches, that the first bullet had entered his left shoulder, and that the remaining three shots were to his head. The bullets recovered were .45–caliber.

The parties stipulated at trial that the tape of the police radio dispatches showed that an officer reported hearing gunshots at 3:02 in the morning and, seventy-two seconds later, appellant was observed running in the 5900 block of Georgia Avenue, north of the scene of Officer Gibson's murder. Officer Kenneth Hillman testified that he saw appellant heading north on Georgia Avenue in the minutes after the shots rang out, first walking briskly and then running northbound with his hands near his waist. Officer Hillman and another officer, Sergeant Linda Nischan, identified themselves as officers and called for appellant to stop as he came out of a "cut" next to an auto dealership and body shop. The officers then observed as appellant reached into his waistband, removed a black handgun, and discarded the gun under a parked car. Ballistics testing later proved that this .45–caliber handgun was the weapon which fired the fatal shots. At the time of his arrest, appellant was wearing a black shirt with a white reflective stripe on each sleeve.

Upon being arrested, appellant immediately claimed that it was his friend, Juan Wilson, who had shot Officer Gibson, and that Wilson had given him the gun "and told him to get rid of it." Appellant was driven to the police station where he was placed in an interview room. Later that

morning, his clothes were seized and his hair combed for evidence. Searches of both his hair and clothing revealed the presence of twenty-two small shards of glass, of which four, the government's expert witness testified, were consistent, though could not be conclusively matched, with the glass of the shattered driver's side window of Officer Gibson's patrol car.[5] At around 10:00 a.m., appellant's hands were tested for gunpowder residue, and the results of this test were negative.[6] Two of the five suspects arrested were also tested for gunpowder residue that morning, and those tests revealed the presence of residue on the left hand of Terrill Turner who had been at the Ibex club that night and was wearing a red jacket with reflective stripes on the sleeves.

Since being brought to the police station around 4:00 a.m., appellant had been left alone in an interview room, handcuffed to the floor, except for the search of evidence from his hair, clothes and hands. Several times, he was offered a drink or use of the restroom, which he refused. Shortly before 11:00 that morning, the police approached him for the purposes of questioning, and gave him full *Miranda* warnings beforehand. Specifically, Detective Robert Parker provided appellant with a standard PD–47 card which lists Fifth Amendment rights and, on the reverse side, has printed questions which ask whether appellant had read and understood the warn-

ings, and is willing to answer questions without the presence of an attorney. Appellant wrote "yes" in response to each question and initialed each response. He listed 10:47 a.m. as the time he executed the PD–47 card.

Through the first twenty or thirty minutes of the interview, appellant continued to blame Wilson for the murder, stating that he saw Wilson fire the shots from the corner of Georgia and Missouri Avenues, and that Wilson had then given him the murder weapon and asked him to get rid of it. The police responded with incredulity, telling appellant that they knew he was lying because they had discovered shell casings next to the driver's side window of the car. One officer raised his voice, and called appellant "a liar." Detective Parker testified that about a half-hour into the interview, appellant said "I haven't told you what happened so far, I will tell you what happened and it's different from what I told you before, but I want to call my grandmother first." Parker agreed to allow appellant to place a call to his grandmother, but only after he "told them the truth." Appellant confessed to firing "three or four shots" into Officer Gibson's patrol car from the street corner, but disclaimed knowing that his target was a police officer. The confession was not videotaped or otherwise recorded. Detective Parker made a written record six hours later; Detective Charles Porter, who

---

**5.** Appellant explained the presence of glass on his hair and clothes by producing evidence that he was arrested in the area around a car dealership, and placed on the ground in a tree box by the body shop. A maintenance employee of the dealership testified that there was "always" broken glass in the area where appellant was forced to lay on the ground. The expert witness testified that her findings were also "not inconsistent" with appellant's lying on the ground on top of broken glass.

**6.** A government expert testified that the lack of gunpowder residue was not a dispositive indication that appellant had not fired a gun earlier that morning, as the residue can be removed by wet conditions (it had been raining that night), or through simple movements such as putting one's hands in pockets. Additionally, the residue will only remain on a person for six to eight hours—as the expert testified, "after eight hours ... forget it [because] the residue is gone"—and the shooting occurred over seven hours before the tests were performed.

assisted in appellant's interview, submitted his written summary the following day. Two other officers, Detectives Anthony Brigadini and Mitchell Credle, testified that they overheard appellant's statements to the police and generally corroborated Detective Parker's and Porter's reports. They testified from memory as neither one had made a written record of what they heard appellant say at the police station.[7]

The trial lasted several weeks. After a day and a half of deliberation, the jury sent a note to the judge which read, "we are hopelessly deadlocked!!" Conferring with counsel, the trial judge proposed to instruct the jury that because they had been deliberating for only a short period of time, they should "deliberate further in this and continue your best efforts." Defense counsel requested that the jury also be instructed to deliberate "without doing violence to their own personal convictions about the case." The court rejected the request, concluding that because the proposed instruction was not an "anti-deadlock" instruction, such language was unnecessary. The jury was brought into the courtroom and the judge addressed them:

> Ladies and gentlemen, good afternoon. I have received your note and I have discussed it with the parties, and I don't want you to think that we are ignoring it.
>
> However, as I started to think about what I wanted to tell you in response to it, I took a look at the clock and realized it was already ten after four, and you have been here most of the day today, and I think the better way to respond is to simply recess your deliberations at

this time and ask you to come back tomorrow morning and start fresh. . . .

> . . . .
>
> . . . [P]lease keep in mind also one of the things I told you on Friday when you recessed, and that is that . . . nothing is final, nothing is fixed.
>
> No opinion that you have expressed is a final one. You should always at all times keep an open mind about the case with a view to listening to the others and expressing your own point of view to see whether you can reach a unanimous decision.

After deliberating for nearly two hours the next morning, the jury returned a verdict of guilty on the counts of first-degree murder of a law enforcement officer, first-degree premeditated murder while armed, possession of a firearm during a crime of violence, and carrying a pistol without a license. The court sentenced appellant to a mandatory term of life without the possibility of parole for murder of a law enforcement officer, as well as concurrent sentences of life without parole for first-degree murder, five to fifteen years for possession of a firearm during a crime of violence, and three to ten years for carrying a pistol without a license. A timely appeal was noted.

*Post-conviction proceedings*

Four years later, appellant filed a motion for a new trial under Rule 33 premised on the discovery of new evidence. *See* Super. Ct.Crim. R. 33. Specifically, appellant presented sworn affidavits from two witnesses who had not testified at trial: (1) Jackie Braxton, who stated that she had seen appellant vomiting moments before she heard the shots, and that "at the very

---

**7.** The trial court expressed dismay that the government had not disclosed the identity of Detectives Brigadini and Credle to the defense until trial, when the prosecutor proffered them as witnesses after Detective Par-

ker's testimony had been called into question. Although the trial court considered disallowing their testimony in limine, the two detectives were permitted to testify. Appellant does not challenge the trial court's ruling.

time the shooting occurred, I could still hear [appellant] heaving and coughing behind me;" and (2) Robert Kinlaw, who stated that he and Juan Wilson had been incarcerated together in 1998 and 1999, and that Wilson had informed him "contrary to his trial testimony, that he knows that [appellant] did not shoot Officer Gibson, and that he did not actually see [appellant] with a gun that evening." The trial judge denied the motion without a hearing, finding it to be barred by the 1999 amendment to Rule 33 which permits new trial motions to be filed only within three years of the jury's verdict. The trial judge further determined that application of the amended rule to the instant motion was not violative of the *Ex Post Facto* Clause of the Constitution, nor did it violate the "just and practicable" standard the federal courts had adopted in judging whether or not this amendment should be given retroactive effect.

Recognizing that there was no pronouncement from this court as to whether the amendment to Rule 33 should be applied retroactively, "in the interests of judicial economy," the trial judge decided to address the merits of the petition, and found that, even if it had jurisdiction over the petition, appellant would not prevail. As for Braxton's affidavit, the judge noted that the government had produced sworn testimony which Braxton subsequently provided to a grand jury which "contradict[ed] every relevant piece of information in her affidavit." Specifically, "Braxton told the grand jury under oath that she was *not* at the IBEX nightclub on February 5, 1997, and that defendant's mother procured her false affidavit, which she signed, but did not read." Thus, the judge concluded that Braxton was highly unlikely to revert to the statements found in the affidavit and that, even if she did so, her "testimony inevitably would be impeached extensively by her sworn grand jury testimony, which would undermine the strength of any testimony she might provide for the defendant." The trial judge found that Kinlaw's testimony would have been hearsay and, even if admissible, would not be likely to produce a different result, as Wilson had already been "thoroughly impeached" at trial and, if Wilson's trial testimony were discounted, the evidence against appellant remained "overwhelming." Because the new evidence was unlikely to produce an acquittal, the judge ruled, appellant was not entitled to a new trial under Rule 33.

## II. The Constitutionality of the Murder Statute for Killing a Law Enforcement Officer

■ Appellant makes a constitutional challenge to the separate first-degree murder offense punishable by "life without parole" for the killing of a law enforcement officer that the killer had "knowledge or reason to know" was such an officer. *See* D.C.Code § 22–2406 (1995 Supp.) (recodified as D.C.Code § 22–2106 (2001)). Appellant's argument is two-fold: that the statute impermissibly violates constitutional guarantees of equal protection because it differentiates sentencing based upon the identity of the victim, and that, by adopting a *mens rea* standard which does not require actual knowledge that the victim is a law enforcement officer, the statute has no value as a deterrent, and hence the sentence imposed is so disproportional to the offense as to be irrational. Though both of appellant's argument are presented as an equal protection challenge, we consider that the latter is more properly addressed under the Eighth Amendment's "cruel and unusual" clause. In any event, we think they are without merit.

At the time of Officer Gibson's murder, the statute provided:

Whoever, with deliberate and premeditated malice, and with knowledge or reason to know that the victim is a law enforcement officer, kills any Metropolitan Police Officer or any other local, federal, or state law enforcement officer engaged in, or on account of, the performance of such officer's official duties [and such killing results], is guilty of murder of a law enforcement officer, and shall be sentenced to life without parole....

D.C.Code § 22–2406 (1995 Supp.).[8]

Parsing the statutory language, the offense consists of five elements: (1) the killing, (2) with deliberate or premeditated malice, (3) of a Metropolitan Police Department officer or other law enforcement official,[9] (4) while the victim was engaged in, or on account of the victim's official duties, and (5) with the defendant having knowledge or reason to know that the victim was a law enforcement officer.

■ The main argument against the statute's constitutionality, which was presented to the trial court, is that it violates the Constitution's Equal Protection Clause [10] because it metes out a different punishment for murder based solely on the identity of the victim. At first blush, this does not even seem a colorable claim. At the heart of equal protection is a guarantee that all persons who are in similar circumstances will be treated similarly. *See Barbier v. Connolly,* 113 U.S. 27, 32, 5 S.Ct. 357, 28 L.Ed. 923 (1885) ("Class legislation, discriminating against some and favoring others, is prohibited, but legislation which, in carrying out a public purpose, is limited in its application, if within the sphere of its operation it affects alike all persons similarly situated, is not within the amendment."). Under the challenged murder statute, all persons who kill law enforcement officers with the required *mens rea* receive the same punishment. *Cf. Marshall v. United States,* 414 U.S. 417, 94 S.Ct. 700, 38 L.Ed.2d 618 (1974) (rejecting an equal protection challenge to the Narcotic Addict Rehabilitation Act of 1966, which provided discretionary drug treatment in lieu of incarceration to first offenders, while denying these services to addicts with two or more prior felony convictions).

■ On the other hand, the statute does carve out a distinction between murderers: those who kill law enforcement officers, and those who kill persons who are not law enforcement officers, and imposes a stiffer mandatory sentence of life without parole (or supervised release) for the former. Assuming that this constitutes a sentencing scheme which makes a distinction be-

**8.** Certain textual changes have since been made, including deletion of the surplus language bracketed in the text, but the substance of the statute remains the same. The words "without parole" have been updated to refer to "without the possibility of release." *See* D.C.Code § 22–2106 (2006 Supp.).

**9.** The statute defines the term "local law enforcement officer" to include officers of the D.C. Department of Corrections, officers of the D.C. Board of Parole, D.C. probation or pretrial services officers and Metro Transit police officers, as well as comparable officers in other jurisdictions. *See* D.C.Code § 22–2106(b) (2001).

**10.** The Fourteenth Amendment provides that "No State shall ... deny to any person within its jurisdiction the equal protection of the laws." By its own terms, this amendment applies solely to the states, and not to the District of Columbia. *See Bolling v. Sharpe,* 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954). However, "it is unquestioned that equal protection principles are embodied in the Due Process Clause of the Fifth Amendment, which does apply" to the District of Columbia. *Hessey v. Burden,* 615 A.2d 562, 567 n. 6 (D.C.1992).

tween offenders who are similarly situated, it is not one that offends principles of equal protection. The statute does not impinge upon the exercise of a fundamental right, nor is it directed against a suspect class, and therefore "we can validly presume that statute's constitutionality." *Backman v. United States,* 516 A.2d 923, 926 (D.C.1986) (citing *City of New Orleans v. Dukes,* 427 U.S. 297, 303, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976)). "[T]he rational basis test is the standard applicable to equal protection challenges to a statutory sentencing classification." *Gibson v. United States,* 602 A.2d 117, 119 (D.C.1992) (citations omitted). This standard affords to the legislature "wide discretion in attacking problems in any rational manner," *id.* (citing *Williamson v. Lee Optical, Inc.,* 348 U.S. 483, 487–88, 75 S.Ct. 461, 99 L.Ed. 563 (1955)), and the statute "will withstand appellant's challenge if its sentencing distinctions are rationally related to a legitimate state interest." *Backman,* 516 A.2d at 926 (citing *McGowan v. Maryland,* 366 U.S. 420, 425–26, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961)). Furthermore, the statute will not be set aside if " 'any state of facts reasonably may be conceived to justify' the statutory discrimination." *Gibson,* 602 A.2d at 120 (quoting *Dandridge v. Williams,* 397 U.S. 471, 485, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970)).

It is beyond peradventure that the legislature has a legitimate interest in separately criminalizing the murder of a police officer, and in mandating a harsher sentence for such an act that directly threatens law enforcement. Considering the federal statutes creating the federal offenses of assault on and murder of a federal officer, 18 U.S.C. §§ 111 & 1114 (2000),[11] the Supreme Court has determined that "Congress may well have concluded that [they were] necessary in order to insure uniformly vigorous protection of federal personnel, including those engaged in locally unpopular activity." *United States v. Feola,* 420 U.S. 671, 684, 95 S.Ct. 1255, 43 L.Ed.2d 541 (1975).[12] Even though, in a moral sense, every life is of equal value, this is not to say that murder of a law enforcement officer in the performance of his or her duties does not pose a special affront to society's efforts to protect the general public from crime. As Eric H. Holder, then-United States Attorney for the District of Columbia, testified before the legislative committee considering the new offense:

> The essence of the crime problem that now afflicts this City can be summed up fairly succinctly: some elements in our community display a shocking disregard for human life and blatant disrespect for the criminal justice system....
>
> ....
>
> [Passage of the mandatory life imprisonment provisions of § 22–2406] accurately reflects the seriousness of the offense and our community's condemnation of it. We ask our law enforcement officers to put their lives on the line every day in order to protect us. It is only fair and proper that we should take the relatively simple steps necessary to enact this law in order to protect them.

---

**11.** Under the federal statute, murder of a federal officer is punishable as first-degree murder by death or life imprisonment. *See* 18 U.S.C. §§ 1111 & 1114.

**12.** In *Feola,* the Court noted that the two federal statutes, for assault on and murder of a police officer, were part of "one bill with a single legislative history" and similarly interpreted the two provisions with respect to congressional intent not to require actual knowledge that the victim is (or was) a law enforcement officer. 420 U.S. at 684 n. 18, 95 S.Ct. 1255.

Statement of Eric H. Holder, Jr., before the Council of the District of Columbia Committee on the Judiciary (July 6, 1994). Thus, the statute reflects a societal judgment that the murder of a law enforcement officer is deserving of additional sanctions, because beyond the taking of a human life, it is an attack on those charged with protecting all of society, and an attack on our justice system. The crime of first-degree murder commands a severe sanction under our law permitting the imposition of a sentence of life in prison, including life without the possibility of parole, in certain circumstances. *See* D.C.Code § 22–2104.01(a) (2005 Supp.) (permitting—but not requiring—the court "to impose a sentence of more than 60 years up to, and including, life imprisonment without possibility of release" upon proof of identified aggravating circumstances). In light of the special societal harm the legislature has identified flows from the murder of a police officer, the statute is aimed at a legitimate governmental interest, and the stiff sentence it requires in all cases where a police officer is murdered is rationally related to advancing that interest. *Cf.* D.C.Code § 22–405(c) (2001) (applying enhanced penalty for assaulting police officer causing "significant bodily injury").

Further, the statute's distinctions are legitimate so long as its application can be justified in any set of circumstances. Our task in evaluating a statute that discriminates in its sentencing scheme is to determine whether "any state of facts rationally justifying (the classification) is demonstrated to or perceived by" the court. *Gibson,* 602 A.2d at 120 (quoting *United States v. Maryland Savings–Share Ins. Corp.,* 400 U.S. 4, 6, 91 S.Ct. 16, 27 L.Ed.2d 4 (1970)). It is difficult to imagine facts which justify the statute more clearly than those presented in this case. Officer Gibson was in full uniform, in a marked squad car, on routine patrol when he was killed. Cer-

tainly, anyone who saw him on that fateful night would have known that he was a police officer on duty. Indeed, Officer Gibson likely was killed in an act of revenge against the police, because appellant had just been ejected from the nightclub by a uniformed MPD member. Therefore, we hold that in mandating a life sentence without possibility of parole or release for the murder of a law enforcement officer, the statute does not violate the Equal Protection Clause.

Appellant also argues that, as applied to those who only have a "reason to know" that the victim is a law enforcement officer, the enhanced sanction lacks any deterrent value, as only those who kill with actual knowledge of their victim's identity would be deterred by the statute's harsher sanction. From this premise, he argues that the statute cannot meet the "rational basis" test. *Id.* at 119.

■ As a threshold matter, it should be noted that § 22–2406 (1995 Supp.) is not a strict liability offense. *See McNeely v. United States,* 874 A.2d 371, 386 (D.C. 2005) (defining a strict liability crime as one where the government need not show a specified mental state of the accused). As is the case under the D.C. statute for assault on a police officer, *see* D.C.Code § 22–405(b), the government must prove, and the jury must find beyond a reasonable doubt, that the defendant either knew, or had reason to know, that his victim was a law enforcement officer. *Cf.* 18 U.S.C. §§ 111 & 1114 (federal strict liability statute for assault on and murder of federal officer); *see Feola,* 420 U.S. at 684, 95 S.Ct. 1255 ("All the statute requires is an intent to assault [or murder], not an intent to assault [or murder] a federal officer."). The facts of this case not only support such a finding, but most likely persuaded the jury that appellant

actually knew that his victim was a police officer. Even assuming that appellant has standing to present this challenge, the question becomes—as a matter of equal protection—whether the government may advance its objective in this manner, that is, guard against the killing of police officers by punishing those who have only "a reason to know" their victim is a law enforcement officer. We conclude that the reduced *mens rea* requirement is rationally related to the objective the legislature sought to achieve. The statute puts criminals on notice that taking the life of a police officer subjects them to the most severe penalty under the law of the District of Columbia. That message should provide a deterrent against those who would kill police officers. The deterrent effect is no less powerful when the murderer commits the killing despite being on reasonable notice that the victim is a law enforcement officer. Mandating the maximum sanction in such circumstances is rational.

■ Although appellant never articulates his claim as an Eighth Amendment challenge, he relies on *Harmelin v. Michigan*, 501 U.S. 957, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991), which considered an Eighth Amendment, and not an equal protection, challenge to a statute requiring a mandatory minimum sanction of life without parole. We understand appellant's implicit argument to be that imposition of mandatory life imprisonment without the

possibility of parole or release on those who lack actual knowledge that their victim is a law enforcement officer is "gross[ly] disproportiona[te]" to their crime. *Cf. Lockyer v. Andrade*, 538 U.S. 63, 72, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003). As discussed above, there is a strong and substantial governmental interest in guarding against and punishing the murder of law enforcement officers. The law already provides a sentence of life without release for first-degree murder where there is proof of aggravating circumstances. *See* D.C.Code §§ 22–2104(a) (2001), 2104.01(a)(b) (2005 Supp.). In essence, the legislature has identified the killing of a law enforcement officer as an aggravating circumstance that requires mandatory imposition of such sentence. The offense of assault on a police officer which, as noted, similarly includes a "reason to know" standard, also imposes a more severe penalty than for simple assault. *See* D.C.Code § 22–405(b). Viewed in relation to these statutes, we cannot say that the sentence mandated for murder of a law enforcement officer is so disproportionate to the offense as to violate the Eighth Amendment.

## III. Voluntariness of Confession

■ Appellant also maintains that the trial court erred in admitting his confession at trial, because his intoxication and the delay in presentment rendered his waiver of *Miranda* rights involuntary.[13]

13. Appellant argues for the first time on appeal that his request to speak to his grandmother was tantamount to a statement that he did not want to talk to the police until after he spoke to her, and therefore amounts to an invocation of his *Miranda* right to remain silent. The record shows that once appellant was permitted to talk to his grandmother—after having confessed—he refused to speak further when the police then tried to obtain a videotape of his statement. Because this argument was not made in the trial court, our

review is for plain error. *See United States v. Olano*, 507 U.S. 725, 732, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) (defining plain error as that which is obvious or plain, affects substantial rights, and results in a miscarriage of justice or seriously affects the fairness and integrity of the trial).

It is unquestioned that once a suspect invokes his *Miranda* right to remain silent, the police must " 'scrupulously honor[ ]' " this request. *Michigan v. Mosley*, 423 U.S. 96, 104,

We conclude there was no error in the admission of his confession.

 Under the Fifth Amendment, a criminal defendant enjoys the right not to be compelled to be a witness against himself. U.S. Const. amend V. In *Miranda,* the Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda, supra* note 1, 384 U.S. at 444, 86 S.Ct. 1602. Ever since, statements by criminal defendants which are the product of custodial interrogation have been held to be inadmissible in the absence of the prophylactic warnings required by *Miranda* which inform criminal defendants as to their various constitutional rights.[14] Like any other rights of a constitutional dimension, for a waiver of these rights to be valid, that waiver must be voluntary, knowing, and intelligent. *See Fare v. Michael C.,* 442 U.S. 707, 724, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979); *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed.

1461 (1938). The Supreme Court has held that "[a]n express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver." *North Carolina v. Butler,* 441 U.S. 369, 373, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979). Nevertheless, when a defendant later challenges the validity of his waiver of *Miranda* rights, "the government has the burden of proving that the waivers of privilege against self-incrimination and the right to counsel were made knowingly, intelligently, and voluntarily." *Di Giovanni v. United States,* 810 A.2d 887, 892 (D.C. 2002) (quoting *In re M.A.C.,* 761 A.2d 32, 36 (D.C.2000)). In considering whether the waiver was voluntary, "the trial court should consider 'the defendant's prior experience with the legal system, the circumstances of the questioning, evidence of coercion or trickery resulting in a confession, and any delay between arrest and confession.'" *Id.* (quoting *Bliss v. United States,* 445 A.2d 625, *modified on other grounds,* 452 A.2d 172 (D.C.1982)). Whether a suspect voluntarily waived his *Miranda* rights is an issue of fact to which

96 S.Ct. 321, 46 L.Ed.2d 313 (1975) (citation omitted). It is also equally clear that if appellant's request to call his grandmother is considered an assertion of the right to remain silent, the officers here did not do so. Though we have not developed law on the particular issue appellant presents, cases from other jurisdictions establish that a suspect's request to speak with another person or obtain some other favor may be tantamount to the assertion of the right to remain silent, but only when the suspect makes clear that any future communication is expressly conditioned on the honoring of that request by the police. *See, e.g., Law v. State,* 21 Md.App. 13, 318 A.2d 859 (Ct.Spec.App.1974) (holding that an injured suspect invoked his right to silence when he stated that he "didn't want to talk anymore" until his injuries were treated); *State v. Harvey,* 121 N.J. 407, 581 A.2d 483, 487, 489 (1990) ("[D]efendant sought to terminate ... interrogation" when he said " 'he

would tell ... about the murder but he first wanted to speak to his father.' "). As we have not addressed this issue, and because the record evidence is that appellant said merely that he wanted to speak with his grandmother, but did not condition the continuation of the interview on the honoring of this request, appellant's claim of error is not so plain or obvious that it requires further discussion on appeal. *See* Super. Ct.Crim. R. 52(b).

14. Specifically, interrogating officers must inform the suspect (1) that he or she has the right to remain silent; (2) that any statement which he or she makes may be used by the government in the ensuing prosecution; (3) that he or she has the right to have an attorney present during questioning; and (4) that an attorney will be provided if the suspect is unable to afford one. *See* 384 U.S. at 444, 86 S.Ct. 1602.

this court defers to the trial court's finding unless it is without substantial support in the evidence or plainly wrong. *See Everetts v. United States,* 627 A.2d 981, 986 (D.C.1993); *Byrd v. United States,* 618 A.2d 596, 598 (D.C.1992); D.C.Code § 17–305(a) (factual findings of a judge are accepted by this court unless they are "plainly wrong or without evidence to support [them]."). The trial court's legal conclusions are reviewed *de novo.* *See In re M.A.C.,* 761 A.2d at 38.

 The only issue which requires extended discussion is whether the trial court erred in concluding that appellant validly waived his *Miranda* rights despite his intoxication at the time of that waiver.[15] The evidence of record is that appellant was drinking heavily until the shooting at 3:00 a.m. When his blood alcohol content (BAC) was measured on the afternoon of his arrest (after his confession) it remained elevated, and, from this evidence, experts testified that his BAC was around .22 to .28 around the time of the murder and .10 to .12 at the time he was interrogated and made his confession. When interviewed as part of a pre-trial report, appellant reported that he drank heavily and on a daily basis, and experts informed the trial judge that though a person's blood alcohol is elevated, those who consume alcohol regularly may develop a tolerance such that high levels of consumption may not affect them as drastically as they might a more temperate person. Despite the fact that appellant had a substantial amount of alcohol in his system, he was able to negotiate the three stories of external steps leading out of the Ibex nightclub minutes before the murder. Immediately after the shooting, appellant had the foresight and cognitive ability to discard the murder weapon and, when arrested, he immediately placed blame for the killing on Wilson. The police officers who arrested appellant did not notice clear signs of intoxication. By the time he was interrogated, appellant had been in police custody for about eight hours, time during which he had been kept confined to an interrogation room, and had been offered opportunities to use the restroom and to have a drink of water. The officers who questioned appellant later that morning did not observe slurred speech, poor motor coordination, incontinence or other physical signs that appellant's functioning was impaired by his intoxication. To the contrary, they described him as "alert" and "coherent."[16] When the officer began the interrogation, he read appellant each of the *Miranda* warnings listed on the PD–47 card, and appellant initialed each question designed to ensure that he understood

---

15. Appellant argues that his confession was rendered involuntary by the fact that he had been in custody for over eight hours without presentment when he confessed to the murder of Officer Gibson. However, we have found delay of a similar length to be insufficient to render the subsequent confession involuntary. *See, e.g., Everetts,* 627 A.2d at 982 (eleven hour delay between arrest and interrogation without presentment); *Bond v. United States,* 614 A.2d 892, 899, 901 (D.C.1992) (thirty-six hour delay between arrest and confession). Additionally, the law of this jurisdiction is that a suspect who validly waives his *Miranda* rights also waives his right to presentment without unnecessary delay. *See Bond,* 614

A.2d at 899; *United States v. Bell,* 740 A.2d 958, 963 (D.C.1999). This "waiver is valid even if obtained during the period of unnecessary delay." *Bell,* 740 A.2d at 963.

16. The trial judge credited testimony from

every single police officer who testified ... consistently that they, one way or another, became aware that [appellant] had been drinking during the evening, ... but ... was coherent, conversational, rational, stable, focused, without slurred speech, without unsteady gait, without incontinence, both during the night and certainly by 10:47 in the morning on February 5th.

these warnings. Having been arrested on two prior occasions, appellant was familiar with the legal system. Indeed, during one of these prior arrests, he invoked his right to counsel, terminating that interview.

■ The fact of intoxication alone will not render the waiver of *Miranda* rights involuntary, but is a factor to be considered in a court's overall evaluation of the issue. *See United States v. Turner,* 157 F.3d 552, 555–56 (8th Cir.1998) (declining to adopt a *per se* rule that would invalidate confessions made under the influence of PCP) (quoting *United States v. Makes Room,* 49 F.3d 410, 415 (8th Cir.1995) ("we decline to adopt a per se rule ... when confronted with intoxication")). Our court, and the courts of other jurisdictions, have found that defendants who were similarly intoxicated were able to waive their *Miranda* rights voluntarily. *See, e.g., Madison v. United States,* 512 A.2d 279, 283 (D.C.1986) (per curiam) ("[T]he evidence that he kept falling asleep, appeared inebriated [at the time of interrogation], and appeared intoxicated at the time of his arrest three hours earlier does not demonstrate that the trial court's finding [that] appellant voluntarily waived his rights upon arriving at the station is clearly erroneous or that his will was overborne by his intoxication."); *White v. State,* 587 So.2d 1218, 1227 (Ala.Crim.App.1990) (confession held to be voluntary, notwithstanding the fact that he had consumed six-to-eight beers, a pint of gin, and several other shots of liquor earlier that day); *State v. Olivas,* 10 Ariz.App. 285, 458 P.2d 379, 385 (1969) (even though appellant had "had a great deal to drink" the evening of the crime and was "limp and unresponsive" at the time of arrest, he validly waived his *Miranda* rights seven and a half hours

later, at which time he appeared "reasonably alert and rested, and did not seem to be suffering from intoxication or hangover."); *Hart v. State,* 296 Ark. 290, 756 S.W.2d 451, 452 (1988) (confession voluntary four hours after appellant's BAC was measured at .12); *People v. Wolfram,* 12 Ill.App.3d 262, 298 N.E.2d 188, 189 (1973) (notwithstanding that at time of arrest "defendant's eyes were dilated, his speech slurred and incoherent," and that "[h]e staggered when he attempted to walk," his waiver of *Miranda* rights eight hours later was voluntary); *Stevens v. State,* 458 So.2d 726, 728 (Miss.1984) (despite the fact that the suspect had a BAC of .16 at the time of arrest, his speech was slurred, and he had fallen from a bunk and broken his arm while in custody, his waiver of *Miranda* rights was voluntary thirteen hours after arrest at which time he displayed no outward signs of intoxication); *State v. Mangum,* 30 N.C.App. 311, 226 S.E.2d 852, 855 (1976).[17] Factors which can be gleaned from these cases, which support voluntariness of the waiver and confession, include a delay of several hours (allowing for "sobering up") between arrest and waiver of rights and interrogation; the fact that the suspect does not display outward signs of drunkenness at the time of waiver and interrogation; and any other indicia that the waiver was produced not by the suspect's intoxication, but by the exercise of his own judgment, such as that the suspect is able to think clearly enough to provide an alibi, or place blame on another person. Considering all the circumstances surrounding appellant's confession: that he was a person with some experience with the criminal justice system, had seven hours to sober up before he waived his rights and responded to police interroga-

**17.** *See also* Wanda Ellen Wakefield, Annotation, *Sufficiency of Showing That Voluntariness of Confession or Admission Was Affected by Alcohol or Other Drugs,* 25 A.L.R.4th 419 (1983, 2006 Supp.).

tion, placed blame on another for the shooting, and despite elevated levels of alcohol in his system,—which experts testified may not have affected appellant as drastically as a person less accustomed to heavy alcohol consumption—displayed no outward signs of intoxication, we cannot say that the trial judge erred as a matter of law in finding that appellant's waiver of rights and confession were voluntary and in admitting appellant's confession at trial.

## IV. Jury Coercion

Appellant argues that the trial court impermissibly coerced the jury to render a verdict when it instructed jurors to "keep an open mind about the case with a view to listening to the others and expressing your own point of view to see whether you can reach a unanimous decision," because the instruction did not remind the jurors that they were nonetheless free to adhere to their independent opinions. In the absence of this warning, appellant argues, the jury was chided to reach a verdict and "compromise their beliefs in the name of expediency."

This court has previously articulated the factors which are to be considered in judging whether a jury has been unduly coerced into rendering a verdict:

> Where it is alleged that a jury verdict has been coerced, our cases demonstrate that two inquiries should be made. The first inquiry is into the inherent coercive potential of the situation before the court. The second inquiry requires an examination of the actions of the trial judge in order to determine whether these actions exacerbated, alleviated, or were neutral with respect to coercive potential. Then the two factors should be viewed together to assess the possibility of actual coercion on any juror or jurors.
>
> . . . .

Factors that help to establish the existence or degree of inherent coercive potential include (but are not limited to): the degree of isolation of a dissenting juror (or jurors), whether the identity of a dissenting juror (or jurors) is revealed in open court as opposed to in a note, whether the exact numerical division of the jury is revealed, whether the judge knows the identity of a dissenting juror (or jurors) and whether the juror is aware of the judge's knowledge, whether other jurors may feel "bound" by a vote they have announced, and whether an "anti-deadlock" instruction has been given and, if so, whether this has occurred under circumstances where the potential for coercion is high.

*Ford v. United States,* 759 A.2d 643, 647 (D.C.2000) (quoting *Harris v. United States,* 622 A.2d 697, 705 (D.C.1993)) (*cert. denied,* 510 U.S. 1129, 114 S.Ct. 1097, 127 L.Ed.2d 410 (1994)). Our task on appeal is to view the particular circumstances of the case from the "perspective of the jurors," *Benlamine v. United States,* 692 A.2d 1359, 1363 (D.C.1997), "[t]o determine whether proceedings crossed the line into undue coercion" as a result of the trial judge's instruction, *Green v. United States,* 740 A.2d 21, 26 (D.C.1999) (citing *Elliott v. United States,* 633 A.2d 27, 30 (D.C.1993)). Reviewing the factors articulated in *Ford* and *Harris,* we conclude that the jury was instructed in circumstances which lacked coercive potential and that the trial court did not abuse discretion in instructing them to keep "an open mind," even without the added cautionary instruction to stay true to their honest opinions.

The circumstances of this case are markedly different from those considered in *Crowder v. United States,* 383 A.2d 336 (D.C.1978), a case relied upon by appellant, where a poll of the jury revealed that the twelfth member of the jury stood alone

against conviction because he did not believe the evidence was sufficient to establish guilt beyond a reasonable doubt. *Id.* at 342. We have characterized that circumstance as "one of very substantial coercive potential," *Harris*, 622 A.2d at 703, and concluded in *Crowder* that there was a high risk that the one dissenting juror identified by the poll could feel coerced into rendering a guilty verdict. As a result, we recommended in *Crowder* that instructions to a jury in such a situation should include the caveat that the jurors should "not surrender [their] honest conviction as to the weight or effect of evidence solely because of the opinion of ... fellow jurors, or for the mere purpose of returning a verdict." *Crowder*, 383 A.2d at 342 n. 11; CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, No. 2.91 (4th ed. 1996). However, we have also stated that this cautionary language is "not ordinarily required," and need be given only "where there is a particularly high likelihood of juror coercion." *Green*, 740 A.2d at 29. Where the situation has a lower potential for coercion, "a trial court [has] more leeway to handle the situation without abusing its discretion." *Harris*, 622 A.2d at 703.

In the present case, all that was known was that the jury reported that it was "hopelessly deadlocked." The court did not know the nature or extent of the impasse, the identity of any holdouts, and did not administer an "anti-deadlock" instruction [18] with coercive potential which generally mandates the language appellant claims was required in this case. *See id.* at 706 (noting the situation lacked coercive potential because no anti-deadlock instruction was given); *Ford*, 759 A.2d at 648 ("Because the judge never gave a *Winters* instruction, there was no real risk of coercion here."). Thus, we conclude that the

situation in which the court instructed the jury in this case had little potential to coerce a juror. Moreover, the actions of the judge were "neutral" as to the effect of any coercive potential. *Ford*, 759 A.2d at 647. The judge did not urge the jurors in the minority to capitulate to the majority, nor did he urge any particular verdict, be it guilt or innocence. All the judge did was to encourage the jurors to keep an open mind, and try to work together to achieve a verdict. On this record, such actions were within the discretion of the trial judge.

## V. Rule 33 Motion for New Trial

■ In considering appellant's appeal of the trial court's denial of his Rule 33 motion for a new trial, we must first address whether appellant's motion was timely filed, as "[t]he time limitations of Rule 33 are jurisdictional." *Diamen v. United States*, 725 A.2d 501, 506 (D.C. 1999) (quoting 3 Charles Alan Wright, FEDERAL PRACTICE & PROCEDURE § 558, at 360 (2d ed. 1982 & Supp. 1998)). At the time of appellant's trial and conviction, Rule 33 provided that motions for a new trial could be filed "within two years after the date of final judgment." Super Ct. Crim. R. 33 (1998). A judgment was not final, under the rule, "until the appellate process had been completed and the appellate court's mandate had been issued." *Arrington v. United States*, 804 A.2d 1068, 1075 (D.C.2002). However, the following year, Rule 33 was amended to require that a motion be filed "within three years after the verdict or finding of guilty." Super. Ct.Crim. R. 33 (2005). In his order promulgating this change, then-Chief Judge Eugene N. Hamilton of the Superior Court of the District of Columbia specified that the amended rule was to "govern all proceedings hereafter commenced and, inso-

---

**18.** *See Winters v. United States,* 317 A.2d 530, 534 (D.C.1974) (en banc).

far as is just and practicable, all proceedings now pending." Order of June 22, 1999.[19] Thus, when appellant brought his motion in February 2002, it was untimely under the version of the rule in effect at the time, but would have been timely under the rule as it existed at the time of trial and conviction.

Appellant contends that the time limit provided in the current version of Rule 33 should not be applied to his petition, as such an application would violate the ex post facto clause of the Constitution, *see* U.S. Const., art. I, § 9, cl. 3; art. I, § 10, cl. 1, and it is neither "just" nor "practicable" to apply the current time limit to his petition. Additionally, appellant argues

that *Arrington* held that the current version of Rule 33 was not to be applied in any case which was then pending appeal.[20] The government, on the other hand, while maintaining (albeit in passing, in a footnote) that the current version of Rule 33 does apply to appellant's motion, gives the jurisdictional argument short shrift, responding in its brief that this court "need not reach the jurisdictional question ... because the trial court's ruling on the merits of the motion was so plainly correct."

▉ We are not of the view that the jurisdictional issue may be so easily set aside. A basic tenet of the exercise of judicial power is that "[w]ithout jurisdic-

19. The Superior Court adopted this change to mirror a December 1998 change to Rule 33's federal analogue. In promulgating the 1998 change to the Federal Rule, the Supreme Court employed identical language in mandating that the changes "shall govern all proceedings in criminal cases thereafter commenced and, insofar as just in practicable, all proceedings in criminal cases then pending." Order Adopting and Amending the Federal Rules of Criminal Procedure, 177 F.R.D. 531 (Apr. 24, 1998). We therefore consider federal decisions interpreting the "just and practicable" standard to be highly persuasive in our own resolution of the issue. *See Diamen,* 725 A.2d at 506 ("Our local Rule 33 is 'identical to the corresponding Federal Rule of Criminal Procedure.' It is therefore to be construed consistently with the federal rule and, in the absence of applicable local precedent, we look to the case law construing Fed. R.Crim.P. 33.") (citations and footnotes omitted).

20. In his brief, appellant maintains that *"Arrington* raised similar facts" because the new trial motion in that case was filed, as here, during the pendency of the appeal. In *Arrington,* the defendant, who had been tried and convicted in 1994, filed a Rule 33 motion in 2000 which would have been timely under the old rule (because his conviction was not yet "final" as his appeal was still pending), and the Superior Court had ruled that because of the 1999 change to the time-frame specified in Rule 33, it was without jurisdiction over the motion. On appeal, the government conceded that the old version of the rule should apply and we "conclude[d] for purposes of [that] case that Arrington's motion was timely," adding that "[i]t is, at least, questionable, whether the new rule may be applied retroactively to render untimely a motion which would have been timely under the old rule." 804 A.2d at 1075. Appellant contends that *Arrington* is thus dispositive of the issue of whether the old rule should be applied to his motion. However, *Arrington* considered a different circumstance than that presented here, as Arrington's ability to file a motion under Rule 33 was immediately foreclosed at the time of the 1999 amendment, whereas appellant in this case still had twenty months after the change to bring a timely motion under the amended rule. We therefore decline to read *Arrington* to stand for the broad proposition that the former version of Rule 33 applies in *all* situations where the amendment occurred while the case was pending appeal. Given that the reasoning of *Arrington* does not address the circumstances raised by the different factual setting of appellant's case, it does not bind our resolution of this case under *M.A.P. v. Ryan,* 285 A.2d 310, 312 (D.C. 1971). *See, e.g., District of Columbia v. Sierra Club,* 670 A.2d 354, 360 (D.C.1996) ("[T]he rule of stare decisis is never properly invoked unless in the decision put forward as precedent the judicial mind has been applied to and passed upon the precise question.") (citations omitted).

tion the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause. And this is not less clear upon authority than upon principle." *Ex parte McCardle,* 74 U.S. (7 Wall.) 506, 514, 19 L.Ed. 264 (1869). "Before reaching the merits of [an] appeal, we must first determine whether we have jurisdiction to entertain it. 'Where a substantial question exists as to this court's subject matter jurisdiction, it is our obligation to raise it, *sua sponte,* even though, as here, no party has asked us to consider it.'" *In re D.M.,* 771 A.2d 360, 364 (D.C.2001) (quoting *Murphy v. McCloud,* 650 A.2d 202, 203 n. 4 (D.C.1994)) (internal brackets omitted). Although we have stated that where the jurisdictional issue presented is very difficult, and the merits are very clearly against the party seeking to invoke the court's jurisdiction, the court may proceed to the latter without resolving the former, *see Stevens v. Quick,* 678 A.2d 28, 31 (D.C. 1996) (citing *Norton v. Mathews,* 427 U.S. 524, 532, 96 S.Ct. 2771, 49 L.Ed.2d 672 (1976)), this is a narrow exception, not an expedient device that permits a court to sidestep the fundamental requirement of jurisdiction. In *Norton,* the Court made clear that the reason it did not need to "resolve the details of these difficult and perhaps close" jurisdictional question was because it had already, on the same day, decided the very issue presented by the merits in a companion case. 427 U.S. at 530, 96 S.Ct. 2771. As a result, that disposition "render[ed] the merits in the present case a decided issue and thus one no longer substantial in the jurisdictional sense." *Id.* at 530–31, 96 S.Ct. 2771; *see Adams v. Vance,* 187 U.S.App. D.C. 41, 45 n. 7, 570 F.2d 950, 954 n. 7 (1978) ("[W]hen the merits of a case are clearly against the party seeking to invoke the court's juris-

diction, the jurisdictional question is especially difficult and far-reaching, and the inadequacies in the record or briefing make the case a poor vehicle for deciding the jurisdictional question, we may rule on the merits without reaching the inappropriately presented jurisdictional contention."). This appeal presents the jurisdictional question squarely, and has been ably briefed by appellant's counsel, so there is no impediment to our ability to decide it. Moreover, for the reasons we now explain, we do not consider that the jurisdictional question presented by appellant is so complex; nor can we say that the merits of his motion are a "decided issue" we have already concluded against appellant. Therefore, before the merits of the Rule 33 motion may be addressed, we must review the Superior Court's determination that it lacked jurisdiction to entertain it.

■ As the order promulgating the change to Rule 33's time frame makes clear, the current time period for filing "within three years after the verdict or finding of guilty," is to "govern all proceedings" commenced after June 1999, as well as those pending at that time "insofar as is just and practicable." Appellant's case had been commenced prior to 1999 but was then pending in that he had been convicted and had filed a notice of direct appeal. The cases considering the contemporaneous change to federal Rule 33 have concluded that where the change to the rule immediately precluded the petitioner from filing a timely motion—the factual situation presented in *Arrington,* see *supra* note 20—it would be neither just nor practicable to apply the new time frame. *See, e.g., United States v. Bowler,* 252 F.3d 741, 746 (5th Cir.2001) (application of new rule would have required defendant to have filed a new trial motion within five months *before* the rule was amended). On the other hand, where the

petitioner still had a significant amount of time following the rule change to bring a timely petition, the federal courts have determined that it is proper to apply the new version of the rule. *See United States v. Correa*, 362 F.3d 1306, 1309 (11th Cir. 2004) (holding similarly where the movant had thirty-four months following the amendment in which to file a timely motion); *United States v. Ristovski*, 312 F.3d 206, 212 (6th Cir.2002) (holding that it was just and practicable to apply the new time limits of Rule 33 to defendant's motion because he had nineteen months following the rule amendment to file a timely motion). In the present case, at the time that Rule 33 was amended, appellant still had twenty months in which he could file a motion for a new trial that would have been timely under the amended rule. Appellant cited to the trial judge the same cases relied upon on appeal, *see United States v. Camacho*, 163 F.Supp.2d 287 (S.D.N.Y.2001);[21] *United States v. West*, 103 F.Supp.2d 1301, 1303 (N.D.Ala.2000),[22] but the trial judge considered the contrary approach taken by the Sixth Circuit in *Ristovski*, and found it to be an appropriate guide for his own consideration of whether it was just and practicable to apply the present deadline in Rule 33 in this case. In other words, the judge recognized that he had a choice to make, and after considering relevant jurisprudence, relied upon his own judgment in choosing among the alternatives, and chose "from a range of permissible alternatives." *See Johnson v. United States*, 398 A.2d 354, 361 (D.C.1979). This is the quintessential

exercise, and not abuse, of judicial discretion and we therefore affirm the trial judge's decision that it is "just and practicable" to apply the amended Rule 33 to appellant's motion for a new trial.

■ Lastly, we have little trouble concluding that doing so does not violate the constitutional prohibition against *ex post facto* laws. Under the *Ex Post Facto* Clause, legislation may not be given retrospective application "which imposes a punishment for an act which was not punishable at the time it was committed; or imposes additional punishment to that then prescribed." *Weaver v. Graham*, 450 U.S. 24, 28, 101 S.Ct. 960, 67 L.Ed.2d 17 (1981) (footnote omitted) (quoting *Cummings v. Missouri*, 71 U.S. (4 Wall.) 277, 325–26, 18 L.Ed. 356 (1867)). Under *Weaver*, a law violative of the *ex post facto* clause may be identified by "two critical elements"; "it must be retrospective, that is, it must apply to events occurring before its enactment, and it must disadvantage the offender affected by it." *Id.* at 29, 101 S.Ct. 960. As the Court has observed, "[t]he constitutional provision was intended to secure substantial personal rights against arbitrary and oppressive legislation, and not to limit the legislative control of remedies and modes of procedure which do not affect matters of substance." *Dobbert v. Florida*, 432 U.S. 282, 293, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977) (citations omitted). *Dobbert* further observed that "[e]ven though [a] change in the law obviously had a detrimental impact upon the defendant, . . .

---

**21.** In *Camacho*, the court held that it was not just or practicable to apply the amended version of Rule 33 "because it would interject an unexpected deadline into the post-trial process." 163 F.Supp.2d at 295. Coming from a single trial court, the *Camacho* pronouncement is entitled to substantially less weight than the appellate decisions we cite in the text.

**22.** We doubt that the decision in *West*, that it would not be just practicable to apply the present version of Rule 33 to the motion at issue, has any continued validity, given that the Eleventh Circuit—of which the Northern District of Alabama is a part—reached a contrary decision in *Correa*.

the law was not *ex post facto* because it neither made criminal a theretofore innocent act, nor aggravated a crime previously committed, nor provided greater punishment, nor changed the proof necessary to convict." *Id.* (discussing, with approval, *Hopt v. Utah*, 110 U.S. 574, 589, 4 S.Ct. 202, 28 L.Ed. 262 (1884)).

Three federal appellate courts that have addressed *ex post facto* challenges to retrospective application of the analogous amendment to Rule 33, have determined that the change is procedural in nature, and therefore constitutionally permissible. *See Ristovski*, 312 F.3d at 212–213; *Correa*, 362 F.3d at 1309; *United States v. Woods*, 399 F.3d 1144, 1147 (9th Cir.2005) ("We conclude that the amendment to Rule 33 was merely a procedural change. It did not affect Woods's substantial rights because the amendment neither increased his punishment nor altered the elements of the crimes or the ultimate facts necessary to establish his guilt. Thus, we hold that applying the amended Rule 33 retroactively does not violate the Ex Post Facto Clause of the United States Constitution."). We agree with the reasoning of those appellate courts, as the change to Rule 33 did not affect its substance, but merely the time frame within which a motion must be filed under the rule. Thus, even though this change had a "detrimental impact upon the defendant," in the sense that it shortened (but did not pre-

clude) the time appellant had to file his motion for a new trial,[23] we conclude that the change is "not ex post facto because it neither made criminal a theretofore innocent act, nor aggravated a crime previously committed...." *Dobbert, supra*, 432 U.S. at 293, 97 S.Ct. 2290.

We therefore hold that the trial court rightly concluded that it lacked jurisdiction over appellant's untimely motion for a new trial. Lacking jurisdiction, it had no authority to address the merits of the motion, and we therefore decline to review its denial on the merits of the motion.

For the foregoing reasons, we affirm appellant's convictions, as well as the denial of his motion for a new trial.

*Affirmed.*[24]

---

**23.** Appellant does not argue that circumstance beyond his control impeded him from filing a new trial motion within the amended time frame.

**24.** The parties agree that appellant's conviction for murder in the first degree merges with his conviction for murder of a law enforcement officer, and we remand the case to the Superior Court for re-sentencing, with instructions that the sentence for murder in the first degree is to be merged with that for murder of a law enforcement officer. *See Byrd v. United States*, 510 A.2d 1035, 1036–37

(D.C.1986) (en banc) (holding that first-degree murder and felony murder of same person merge). This disposition renders moot appellant's argument that his right to a jury finding under *Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), was violated by the enhancement of his sentence for first-degree murder to life without the possibility of parole based on the trial judge's finding that this was an "especially heinous" and random shooting. D.C.Code § 22–2404(b)(4)(5).