**Ernest W. THOMAS, Appellant,**

v.

**UNITED STATES, Appellee.**

**Nos. 09–CF–491, 10–CO–768.**

District of Columbia Court of Appeals.

Argued Nov. 23, 2010.

Decided April 12, 2012.

David H. Reiter, for appellant.

Helenanne Listerman, Assistant United States Attorney, with whom Ronald C. Machen Jr., United States Attorney, and Roy W. McLeese III, Elizabeth Trosman, Mary B. McCord, Dorann E. Banks, and Keith A. Becker, Assistant United States Attorneys, were on the briefs, for appellee.

Before FISHER, Associate Judge, RUIZ, Associate Judge, Retired,* and FARRELL, Senior Judge.

RUIZ, Associate Judge, Retired:

Two appeals arising from the same criminal conviction are before the court. In 2008, an indictment was filed charging appellant with two counts of sexual abuse. Prior to trial, appellant filed a motion to dismiss one of the counts as violative of the *Ex Post Facto* Clause of the United States Constitution. He also filed a motion under Superior Court Rules of Criminal Proce-

dure 8(a) and 14 to sever the two counts into separate trials. Both motions were denied. The case proceeded to trial and appellant was convicted of both counts of sexual abuse. Appellant filed a direct appeal, raising the same arguments he made in his two pretrial motions. Several months later, while the direct appeal was pending, appellant also filed a motion to vacate his sentence, under D.C.Code § 23–110 (2001), claiming ineffective assistance of counsel. This motion was denied without a hearing, and appellant has also appealed this denial. We conclude that appellant has suffered no deprivation of his constitutional rights under the *Ex Post Facto* Clause or the Sixth Amendment, and that the trial court did not abuse discretion in trying both counts in the same trial. We, therefore, affirm appellant's convictions.

## I. Facts

Appellant was charged with two counts of first-degree sexual abuse, with aggravating circumstances (force), in violation of D.C.Code §§ 22–3002 and –3020(a)(5) (2001). The counts related to sexual assaults against two different women; the first occurred in 2000, and the second in 2005.

In the first incident, a woman (C.M.) was waiting at a bus stop on the afternoon of July 17, 2000, when she was approached by a man whom she did not know. The man told her that he had drugs with him, and asked her whether she would like to "get high" with him nearby. C.M., a heavy user of crack-cocaine and heroin, agreed, and she followed the man to an apartment inside an abandoned building. They crawled through a hole and entered a room that was empty except for a mattress and

---

* Judge Ruiz was an Associate Judge of the court at the time of argument. Her status changed to Associate Judge, Retired, on September 1, 2011.

a chair. Once they were inside, the man grabbed C.M. by the throat and pinned her down on the mattress. When she screamed, he told her to "shut up" and punched her in the mouth. The woman told appellant that she was pregnant and pleaded with him to "please [not] hurt my baby." She also pulled out a small knife that she had been carrying with her, in an attempt to fend off her attacker. The man overpowered C.M. and knocked the knife away, cutting her arm in the process. He then sexually assaulted her by penetrating her vaginally and ejaculating inside of her. The man left immediately thereafter. C.M. came out of the building, ran "up the street," and sought help from Elneta Chance, whom she encountered on the street. Ms. Chance promptly called the police, and an officer arrived at the scene within minutes. The officer saw that C.M. was bleeding from her left arm. C.M. took the officer to the abandoned building and showed him the room where the assault had occurred. C.M. was taken to the hospital, where a sexual assault examination was performed. The examining physician noted that C.M. had "a scratch on the right side of her face[,] . . . what appeared to be a stab wound on her left arm and a bruise on her right knee." In the course of the examination, a semen sample was obtained from a vaginal swab. This sample would eventually be matched to appellant's DNA eight years later.

A.M.H., the victim of the second incident, testified that she was home alone in her apartment on the evening of November 29, 2005, when appellant rang her doorbell and asked to see her "sister," "Nikki." A.M.H. recognized appellant from having smoked crack-cocaine with him once about a year before—at that time, she had met appellant on the street and invited him into her apartment to "smoke[ ] . . . crack cocaine"; he "propositioned [her] . . . to exchange sex for drugs," which she declined to do. A.M.H. allowed appellant into her apartment and offered to get Nikki's phone number for him while he waited. Appellant told A.M.H. that he was "going to purchase some crack" and she responded that she "no longer used" the drug. After giving appellant Nikki's phone number, and letting appellant use her bathroom, A.M.H. escorted appellant to the door. On the way to the door, appellant grabbed A.M.H. by the throat and threw her on to a bed in the living room. A.M.H. screamed. She then grabbed a broken T.V. antenna and stabbed appellant in the face with it. As the fight continued around the room, appellant attempted to choke A.M.H. several times. Appellant told A.M.H. to "shut up" and threatened to kill her if she did not submit to him. She eventually complied, and appellant sexually assaulted her, penetrating her vaginally and ejaculating inside of her. A.M.H. ran outside without any clothes on, and waited for appellant to leave her building. As appellant left the building, he walked by her and said, "Shut up, [b]itch, I don't know what you [are] crying for. I paid you." A.M.H. testified she "didn't know" what was meant by his statement. A.M.H. was let back inside her building by her neighbor's son and immediately went and knocked on the door of a neighbor's apartment. Upon opening the door, the neighbor saw A.M.H. naked, injured, and visibly shaken up. From the neighbor's apartment, A.M.H. phoned her husband, who returned home and called the police. He observed that their apartment was in total disarray, with a lamp broken and the T.V. knocked off of its stand. The police arrived and A.M.H., who was crying and upset and held a washcloth with ice on her cut lip, was taken to the hospital for a sexual assault examination. A nurse noted that A.M.H. had "bruises on [her] face and lip, scratch-

es on [her] chest, reddened areas on [her] chest, an open area on [her] right hand, bruises [on] her left cheek and bruises on her left neck." A semen sample, which would later be identified as having come from appellant, was also obtained during the examination.

About two years later, on December 20, 2007, A.M.H. was eating at a Wendy's restaurant with her husband when she saw appellant enter the Wendy's. She recognized appellant as the person who had assaulted her in 2005 and told her husband, who went outside to inform a police officer. Appellant was formally interviewed by the police later that day and denied knowing A.M.H. He gave a blood sample to the police on December 27, 2007. The resulting DNA analysis matched the semen samples from the sexual assaults in 2000 and 2005. Appellant was charged with two counts of first-degree sexual abuse on April 9, 2008, and was arrested on June 4, 2008. A grand jury indicted appellant on August 27, 2008, and the two counts were joined for a single trial.

Prior to trial, appellant made a motion to dismiss the count relating to the assault that occurred in 2000. He claimed that, because in 2000 the statute of limitations for sexual abuse had been six years, the indictment in August 2008, eight years later, was barred as untimely. The statute of limitations for sexual abuse was extended to fifteen years in 2005, but appellant argued that, to the extent the longer limitations period applied retroactively, the extension violated the *Ex Post Facto* Clause of the United States Constitution. The trial court denied appellant's motion at a status hearing on December 19, 2008, ruling that the *Ex Post Facto* Clause had not been violated because the statute of limitations for the 2000 incident had not yet expired when it was extended in 2005.

Appellant also filed a pretrial motion to sever the two sexual abuse counts, arguing that they had been improperly joined under Rule 8(a), or, in the alternative, that they should be severed under Rule 14 because he would be unduly prejudiced if he had to defend against both counts in the same trial. The government opposed the motion, arguing that the counts had been properly joined, and that they need not be severed because evidence of each crime would be admissible in a trial for the other to prove intent and identity. This motion also was denied at the status hearing.

A trial on both counts was held in January of 2009. At trial, appellant admitted to having sexual encounters with both women on the dates charged, but claimed he did not assault them. He testified that he had sexual intercourse with C.M. in the abandoned apartment building, but alleged that the intercourse had been a consensual money-for-sex transaction. He had said he would pay her $20, but had only given C.M. $10, which angered her and caused her to leave the building and accuse him of sexual assault. Appellant also admitted that he had gone to A.M.H.'s apartment hoping to have sex with her. According to appellant, they had had sex three times at the apartment prior to the day in question, and that on November 29, 2005, he had tried to have consensual sex with her, but had ejaculated on her prematurely before intercourse ever began. Appellant stated that he had then given her $50 to buy crack-cocaine for them to share, and in so doing, had warned her not to cheat him out of his half, as he asserted she had done in the past. This allegedly made A.M.H. angry and resulted in a physical confrontation, which he said explained the apartment's disarray and A.M.H.'s injuries.

Appellant was found guilty of both counts of first-degree sexual abuse, with aggravating circumstances, and was sen-

tenced to thirty years' imprisonment followed by ten years of supervised release, and ordered to pay a $200 fine to the Victims of Violent Crimes Compensation Fund. He filed a timely notice of appeal.

In his direct appeal, appellant raises the two issues that formed the basis of his pretrial motions: (i) his motion to dismiss the count relating to the 2000 incident because the extension of the statute of limitations for sexual abuse violated the *Ex Post Facto* Clause; and (ii) his motion to sever the two counts because they were improperly joined under Rule 8, or, in the alternative, because they should have been severed under Rule 14.

On November 11, 2009, while his direct appeal was pending, appellant also filed a motion to vacate his sentence under D.C.Code § 23–110. He claimed that his trial counsel was ineffective for failing to present "a medical expert to serve as rebuttal evidence against the government's witnesses and their ability to recall due to their state of mind as crack cocaine users." On June 10, 2009, the trial court denied the § 23–110 motion without a hearing. Appellant's appeal of that denial was consolidated with the direct appeal of his criminal conviction. We consider the issues raised on the direct appeal first, and then discuss the § 23–110 motion.

## II. Extension of Statute of Limitations and the *Ex Post Facto* Clause

As described above, one of the counts of first-degree sexual abuse arose from an assault that occurred on July 17, 2000. In 2000, the statute of limitations then in effect provided that, for most felonies, in-cluding sexual abuse, "a prosecution ... is barred if not commenced within six (6) years after it is committed." D.C.Code § 23–113(a)(2) (1981). Appellant was indicted on August 27, 2008, more than eight years after the offense was committed. *See* D.C.Code § 23–113(c) (2001) ("A prosecution is commenced when: (1) an indictment is entered; (2) an information is filed; or (3) a complaint is filed before a judicial officer empowered to issue an arrest warrant; ...."). Appellant argues that the prosecution was therefore violative of the *Ex Post Facto* Clause of the Constitution.[1] This is a legal question we review *de novo.* *See United States v. McMillian,* 898 A.2d 922, 930 (D.C.2006).

A six-year statute of limitations for the charge of first-degree sexual abuse based on the assault on C.M. would have expired on July 17, 2006; however, effective May 10, 2005, prior to expiration of the six-year period, the statute was amended to increase the limitations period to fifteen years by the Felony Sexual Assault Statute of Limitations Amendment Act of 2004, 52 D.C.Reg. 1178 (2004) (the "Felony Sexual Assault Act"). *See* D.C.Code § 23–113(a)(2) (2005 Supp.) ("A prosecution for the following crimes ... is barred if not commenced within fifteen (15) years after it is committed: (A) first-degree sexual abuse...."). The Felony Sexual Assault Act made clear that the new, longer limitations period would "apply to an offense committed before its effective date *only if the statute of limitations for the offense has not expired prior to the effective date.*" 52 D.C.Reg. 1178 at § 3 (emphasis added). It is this retroactive application of the

---

1. "Under the *Ex Post Facto* Clause, legislation may not be given retrospective application 'which imposes a punishment for an act which was not punishable at the time it was committed; or imposes additional punishment to that then prescribed.'" *Dean v. Unit-* ed States, 938 A.2d 751, 753, 770 (D.C.2007) (quoting *Weaver v. Graham,* 450 U.S. 24, 28, 101 S.Ct. 960, 67 L.Ed.2d 17 (1981) (citing U.S. Const. art. 1, § 9, cl. 3; art. I, § 10, cl. 1)).

longer limitations period that appellant contends violates the *Ex Post Facto* Clause.

■■■■ The general rule is well-settled. "Under the *Ex Post Facto* Clause, legislation may not be given retrospective application 'which imposes a punishment for an act which was not punishable at the time it was committed; or imposes additional punishment to that then prescribed.' ... [A] law violative of the *ex post facto* clause may be identified by 'two critical elements'; 'it must be retrospective, that is, it must apply to events occurring before its enactment, and it must disadvantage the offender affected by it.'" *Dean v. United States,* 938 A.2d 751, 770 (D.C.2007) (quoting *Weaver,* 450 U.S. at 28–29, 101 S.Ct. 960 (1981)). Not all changes in law which are disadvantageous to a defendant violate the *Ex Post Facto* Clause, however, and a law will not violate the clause if it "neither made criminal a theretofore innocent act, nor aggravated a crime previously committed, nor provided greater punishment, nor changed the proof necessary to convict." *Id.* at 771 (quoting *Dobbert v. Florida,* 432 U.S. 282, 293, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977)).

Appellant relies on *Stogner v. California,* 539 U.S. 607, 123 S.Ct. 2446, 156 L.Ed.2d 544 (2003), where the Supreme Court applied the *Ex Post Facto* Clause to bar prosecutions based on extension of a lapsed statute of limitation. In *Stogner,* the Court considered a California law that allowed prosecutions for sex-related child abuse crimes whose statute of limitations had already expired. *Id.* at 609, 123 S.Ct. 2446. Under the statute, if the victim had reported the crime, clear and convincing evidence corroborated the report, and charges were brought within one year of the victim's report, the prosecution of the child sex-abuse crime would operate to "revive any cause of action barred by [pri-

or statutes of limitations]." *Id.* (alteration in original) (citing CAL.PENAL CODE § 803(g)(3)(A) (2003 Supp.)). The petitioner in *Stogner* had been successfully prosecuted for various sex abuse crimes involving children that had occurred decades earlier; the statute of limitations for the most recent of the petitioner's crimes had expired twenty-two years prior to his indictment. *Id.* at 610, 123 S.Ct. 2446. On certiorari, the petitioner argued that the law which had allowed his prosecution violated the *Ex Post Facto* Clause.

The Court, in a three-part analysis, agreed with the petitioner and vacated his convictions. *First,* the Court compared the effect of California's revival of the expired statutes of limitations against the general types of harm that the *Ex Post Facto* Clause guards against. Fundamentally, according to the Court, "the Clause protects liberty by preventing governments from enacting statutes with 'manifestly *unjust and oppressive*' retroactive effects." *Id.* at 611, 123 S.Ct. 2446 (quoting *Calder v. Bull,* 3 U.S. 386, 391, 3 Dall. 386, 1 L.Ed. 648 (1798)). Components of this protection include: (1) a safeguard against unfairness, *id.* ("extending a limitations period after the State has assured 'a man that he has become safe from its pursuit ... seems to most of us unfair and dishonest'") (quoting *Falter v. United States,* 23 F.2d 420, 426 (2nd Cir.1928)); (2) a safeguard against the loss of "fair warning," *id.* (quoting *Weaver,* 450 U.S. at 28, 101 S.Ct. 960); (3) a safeguard against the loss of evidence, *id.* ("The statute of limitations is an amnesty, declaring that after a certain time the offender shall be at liberty to return to his country and may cease to preserve the proofs of his innocence") (alterations omitted) (quoting F. WHARTON, CRIMINAL PLEADING AND PRACTICE ("WHARTON") § 316, p. 210 (8th ed. 1880)); and (4) a safeguard against capricious leg-

islative action, *id.* ("[A] Constitution that permits such an extension, by allowing legislatures to pick and choose when to act retroactively, risks both 'arbitrary and potentially vindictive legislation,' and erosion of the separation of powers.") (quoting *Weaver*, 450 U.S. at 29 & n. 10, 101 S.Ct. 960). The Court concluded that the California law caused these types of harm and therefore violated the general principles of the *Ex Post Facto* Clause. *See id.*

*Second,* the Court inquired whether the California law fell into any of the four categories of *ex post facto* laws identified over 200 years ago in *Calder v. Bull,* an opinion recognized as providing both "an authoritative account of the scope of the *Ex Post Facto* Clause," *Stogner,* 539 U.S. at 611, 123 S.Ct. 2446, and " 'an exclusive definition of *ex post facto* laws,' " *id.* at 635, 123 S.Ct. 2446 (Kennedy, J., dissenting) (quoting *Collins v. Youngblood,* 497 U.S. 37, 42, 110 S.Ct. 2715, 111 L.Ed.2d 30 (1990)). In *Calder,* Justice Chase sought to define what the Framers had meant by the term "ex post facto law" when it was included in the Constitution. The definition crafted was informed by the types of "acts of violence and injustice" committed by the Parliament of Great Britain in the Seventeenth and Eighteenth centuries. It was concern for these legislative excesses that prompted *ex post facto* law prohibitions in the United States Constitution and in the constitutions of several of the original states. *Calder,* 3 U.S. at 389 (referring to the constitutions of Delaware, Maryland, Massachusetts, Pennsylvania, North Carolina and South Carolina). Justice Chase explained:

> I will state what laws I consider ex post facto laws, within the words and the intent of the prohibition. 1st. Every law that makes an action, done before the passing of the law, and which was innocent when done, criminal; and punishes such action. 2nd. Every law that aggravates a crime, or makes it greater than it was, when committed. 3rd. Every law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed. 4th. Every law that alters the legal rules of evidence, and receives less, or different, testimony, than the law required at the time of the commission of the offence, in order to convict the offender. All these, and similar laws, are manifestly unjust and oppressive.

*Calder,* 3 U.S. at 390–91; *see Commonwealth v. Bargeron,* 402 Mass. 589, 524 N.E.2d 829, 830 (1988) (describing Justice Chase's categories in *Calder* as a "primordial" part of *Ex Post Facto* Clause jurisprudence).

In *Stogner,* the Court thought that the California law in question clearly fell within the second of Justice Chase's categories. Prior to the law's passage, the government of California was no longer able to prosecute the petitioner because the statute of limitations for his crimes had expired long ago. Thus, at that time, the petitioner had not been " '*by law, liable to any punishment.*' " *Stogner,* 539 U.S. at 613, 123 S.Ct. 2446 (quoting *Calder,* 3 U.S. at 389). By restoring the possibility of criminal liability, the statute had " 'aggravated' [the petitioner's] alleged crime, or made it 'greater than it was, when committed,' in the sense that, and to the extent that, it 'inflicted punishment' for past criminal conduct that (when the new law was enacted) did not trigger any such liability." *Id.* (quoting *Calder,* 3 U.S. at 389, 390).

*Third,* the Court in *Stogner* observed that the overwhelming weight of "legislators, courts and commentators have long believed it well settled that the *Ex Post Facto* Clause forbids resurrection of a time-barred prosecution." *Id.* The Court identified evidence to support this proposi-

tion from several sources: legislative debates from as long ago as the aftermath of the Civil War, citing Cong. Globe, 39th Cong., 2d Sess., 68, 69 (1866–1867); holdings from cases in the Nineteenth Century, *e.g., State v. Sneed,* 25 Tex.Supp. 66, 67 (Tex.1860); and *Moore v. State,* 43 N.J.L. 203, 216–17 (N.J.Err. & App.1881); holdings from contemporary cases, *e.g., People v. Shedd,* 702 P.2d 267, 268 (Colo.1985) (en banc) (per curiam); *State v. Nunn,* 244 Kan. 207, 768 P.2d 268, 277–78 (1989); *Commonwealth v. Rocheleau,* 404 Mass. 129, 533 N.E.2d 1333, 1334 (1989); and *State v. Hodgson,* 108 Wash.2d 662, 740 P.2d 848, 851–52 (1987) (en banc); and the conclusions reached by commentators, citing 4 W. LaFave, J. Israel, & N. King, Criminal Procedure ("LaFave"), § 18.5(a), at 718, n.6; Alan L. Adlestein, *Conflict of the Criminal Statute of Limitations with Lesser Offenses at Trial,* 37 Wm. & Mary L.Rev. 199, 246 (1995). *See Stogner,* 539 U.S. at 616–19, 123 S.Ct. 2446.

Recognizing that it had not yet spoken "decisively" on the matter, the Court held that prosecution under a law that had revived petitioner's exposure to criminal prosecution after the statute of limitations had lapsed violated the *Ex Post Facto* Clause. *Id.* at 620, 123 S.Ct. 2446. The Court's holding was "determined [1] by the nature of the harms that California's law creates, [2] by the fact that the law falls within Justice Chase's second category as

Chase understood that category,[2] and [3] by a long line of authority holding that a law of this type violates the *Ex Post Facto* Clause." *Id.* at 620–21, 123 S.Ct. 2446.

■ Applying the principles the Court recognized in *Stogner,* we come to a different conclusion here. We note, at the outset of our analysis, that there is one very significant difference between the facts of *Stogner* and the facts of appellant's case: the statute of limitations for appellant's sexual abuse charge was extended *before* it had expired. In fact, the Court in *Stogner* distinguished the extension of an *expired* limitations period from the revival of an *unexpired* limitations period:

> Even where courts have upheld extensions of *unexpired* statutes of limitations (extensions that our holding today does not affect), they have consistently distinguished situations where limitations periods have expired. Further, they have often done so by saying that extension of existing limitations periods is not *ex post facto* "provided," "so long as," "because," or "if" the prior limitations periods have not expired—a manner of speaking that suggests a presumption that revival of time-barred criminal cases is not allowed. *E.g., United States v. Madia,* 955 F.2d 538, 540 (8th Cir.1992) ("provided"); *United States v. Richardson,* 512 F.2d 105, 106 (3d Cir.1975) ("provided"); *People v. Anderson* [53 Ill.2d 437], 292 N.E.2d 364, 366 (Ill.1973) ("so long

**2.** The *Stogner* Court thought that the law could also fall into *Calder's* fourth category. Because "a statute of limitations reflects a legislative judgment that, after a certain time, no quantum of evidence is sufficient to convict," 539 U.S. at 615, 123 S.Ct. 2446, the revival of criminal liability for an act otherwise beyond the reach of prosecution due to the expiration of the statute of limitations could be viewed as " 'alter[ing] the legal rules of evidence ... in order to convict the offender.' " *Id.* at 612, 123 S.Ct. 2446 (quoting *Calder,* 3 U.S. at 390–91). This conclusion was

bolstered by the observation, commonly made, that statutes of limitations reflect a concern for the loss of reliable evidence due to the passage of time. *Id.* at 616 (citing *United States v. Kubrick,* 444 U.S. 111, 117, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979); 4 LaFave § 18.5(a), p. 718 (1999)). This was a particularly pertinent consideration in the case before the Court, where more than forty years had passed since the commission of some of the offenses for which petitioner had been convicted.

as"); *United States v. Haug,* 21 F.R.D. 22, 25 (N.D.Ohio 1957) ("so long as"); *United States v. Kurzenknabe,* 136 F.Supp. 17, 23 (D.N.J.1955) ("so long as"); *State v. Duffy* [300 Mont. 381], 6 P.3d 453, 460 (Mont.2000) ("because"); *State v. Davenport,* 536 N.W.2d 686, 688 (N.D.1995) ("because"); *Andrews v. State,* 392 So.2d 270, 271 (Fla.App.1980) ("if").

*Id.* at 618, 123 S.Ct. 2446 (citations altered from original). The Court's parenthetical phrase "extensions that our holding today does not affect," *id.,* could be interpreted as either implicitly approving of the cited decisions of other courts, or as explicitly leaving the issue undecided. Many courts interpreting *Stogner* have adopted the former view, holding that the constitutionality of extending an unexpired statute of limitations is clearly supported by *Stogner. See, e.g., Renderos v. Ryan,* 469 F.3d 788, 795 (9th Cir.2006) (noting that limitations period extension enacted while former limitations periods "were still running ... is, therefore, precisely the type of statute that *Stogner* expressly stated it was *not* striking down"); *People v. Terry,* 127 Cal.App.4th 750, 775, 26 Cal.Rptr.3d 71 (2005) ("As *Stogner* indicates, extensions of existing, unexpired limitations periods are not ex post facto because such extensions do not resurrect otherwise time barred prosecutions."); *Mordja v. Montana Eleventh Judicial Dist. Ct.,* 341 Mont. 219, 177 P.3d 439, 443 (2008) ("[T]he *Stogner* Court specifically distinguished cases concerning extensions of unexpired statutes of limitations, holding that such cases did not violate the *ex post facto* clause."); *State v. Morales,* 148 N.M. 305, 236 P.3d 24, 26 (2010) ("Although the extension of a statute of limitations cannot revive a previously time-barred prosecution, *Stogner,* 539 U.S. at 607, 123 S.Ct. 2446, ... it can extend an unexpired limitation period because ... [it] does not

impair vested rights acquired under prior law, require new obligations, impose new duties, or affix new disabilities to past transactions."); *State v. Aubrey,* 175 Ohio App.3d 47, 885 N.E.2d 251, 253 (2008) ("*Stogner* was careful to state that a legislature may extend a statute of limitations when it had not already expired."). As this proposition, however, was not necessary to the holding in *Stogner,* we consider appellant's claim under the framework provided by the Court in *Stogner.*

The extension of an unexpired statute of limitations does not implicate any of the concerns raised by the *Stogner* Court in the first step of its analysis. In 2005, when the six-year statute of limitations was extended to fifteen years, appellant was subject to prosecution for the crime he committed in 2000; thus, it was never the case that he had "become safe from [the State's] pursuit." *Falter,* 23 F.2d at 426. Because of this, there was no point at which appellant reasonably "may [have] cease[d] to preserve the proofs of his innocence," WHARTON § 316, p. 210, had he been theoretically preserving any such evidence. Nor is there any indication, cited by appellant or apparent to the court, that the Felony Sexual Assault Act was "arbitrary and potentially vindictive legislation," *Weaver,* 450 U.S. at 29, 101 S.Ct. 960, or that appellant may have at any point been deprived of "fair warning" that he was subject to criminal liability, *id.* at 28, 101 S.Ct. 960. In short, the extension of the statute of limitations in this case did not result in any of the " 'manifestly *unjust and oppressive'* retroactive effects" contemplated by the *Ex Post Facto* Clause. *Stogner,* 539 U.S. at 611, 123 S.Ct. 2446 (quoting *Calder,* 3 U.S. at 390–91).

The Felony Sexual Assault Act also does not fall within any of the four categories of *ex post facto* laws identified in *Calder* that

*Stogner* addressed in the second prong of its analysis. The elements of and punishment for first-degree sexual assault were not altered by the Act. Unlike the revival of cause of action for criminal liability at issue in *Stogner*, the extension of the limitations period at issue here has neither " 'aggravated' " a crime nor "made it 'greater than it was,' " 539 U.S. at 613, 123 S.Ct. 2446 (quoting *Calder*, 3 U.S. at 390), because appellant was never free from prosecution. He was in the same position before and after passage of the Felony Sexual Assault Act—subject to being charged and prosecuted for a sexual assault that took place in 2000. Nor was this a law "that alter[ed] the legal rules of evidence ... in order to convict the offender," *Calder*, 3 U.S. at 390, because there was never a "conclusive presumption forbidding prosecution," as there would have been if the former limitations period had lapsed. *Stogner*, 539 U.S. at 616, 123 S.Ct. 2446. And as noted above, because the statute of limitations never expired, appellant was not placed in a situation where he might have discarded evidence of his inno-

cence that he otherwise would have continued to preserve.[3] *Accord State v. Gum*, 214 Ariz. 397, 153 P.3d 418, 422–23 (App. 2007) ("Extension of [an unexpired] limitations period does not criminalize previously innocent conduct, does not increase the punishment for an existing crime, and ... does not deprive [the defendant] of any defense available according to the law at the time he committed the crimes. Further, the amendment as applied to [the defendant] does not deprive him of any defense that would have been available to him on the effective date of the amendment."); *State v. Martin*, 151 N.H. 107, 849 A.2d 138, 140 (2004) ("[T]he extension of the unexpired statute of limitations did not alter an element of the crime, 'did not change the ultimate facts needed to prove guilt, nor did it punish a previously innocent act.' ") (quoting *State v. Hamel*, 138 N.H. 392, 643 A.2d 953 (1994)).

Finally, the weight of authority strongly supports the conclusion that the Act is not an *ex post facto* law. This authority existed prior to the Court's holding in *Stogner*.[4]

3. In *Stogner* the Court voiced a concern for the loss of reliable evidence due to the passage of time. 539 U.S. at 616, 123 S.Ct. 2446; *see also Hobson v. District of Columbia*, 686 A.2d 194, 198 (D.C.1996) (noting that statutes of limitation are intended " 'to bar efforts to enforce stale claims as to which evidence might be lost or destroyed' ") (quoting *Poole v. Terminix Co. of Maryland and Washington, Inc.*, 200 F.2d 746, 747 (D.C.Cir. 1952)). In this case, the primary evidence against appellant for the 2000 assault was the testimony of the woman who was assaulted, which was corroborated by another person who saw her immediately after the attack, contemporaneous police reports, and the results of DNA testing. Appellant testified in his own defense, and he has not identified any favorable evidence that has been lost to him as a result of the two-year extension that application of the Act allowed for prosecution of the 2000 assault. In contrast, the passage of time was a concern in *Stogner* because some of the crimes for which the petitioner

had been indicted had occurred forty-three years earlier. See note 2, *supra*.

4. In a pre-*Stogner* case, *People ex rel. Reibman v. Warden of Cnty. Jail at Salem*, 242 A.D. 282, 275 N.Y.S. 59 (1934), the court reached a similar conclusion based on the considerations of public policy that underpin statutes of limitations for criminal cases. The court explained that "[i]n the absence of statutes of limitation ... a prosecution may be instituted at any time ... [a]n act of limitation is an act of grace ... [and] [t]he State makes no contract with criminals ... that they shall have immunity from punishment if not prosecuted within the statutory period." *Id.* at 62. Such reprieve exists only if affirmatively adopted by the legislature as a matter "of public policy," *id.*, and unless and until the limitations period has expired, "the flaw which the crime had created in the offender's title to liberty," *Moore v. State*, 43 N.J.L. 203, 209 (N.J.Err. & App.1881), remains subject to continued modification, and even repeal, by the state. *Reib-*

*See Stogner,* 539. U.S. at 618–19, 123 S.Ct. 2446 (collecting cases from various state courts); *id.* at 634, 123 S.Ct. 2446 (Kennedy, J., dissenting) (citing nine additional cases); *see also United States v. Grimes,* 142 F.3d 1342, 1351 (11th Cir.1998) (reviewing cases and noting that all U.S. Circuit Courts facing this issue have found no violation of the *Ex Post Facto* Clause); LaFave, § 18.5(a), at 718, n.6 ("the application of [a lengthened statute of limitations] to ... crimes not yet time-barred does not violate the ex post facto clause."); 21 Am. Jur. 2d 349–50, *Criminal Law* § 294 (1998) ("Where a statute extends the period of limitation, the extension applies to offenses not barred at the time of the passage of the act, so that a prosecution may be commenced at any time within the newly established period."). And, as discussed earlier, courts have continued to so hold post-*Stogner.*

In sum, unlike the revival of criminal liability after a lapsed statute of limitations considered in *Stogner,* the extension of the limitations period at issue here, while the previous limitations period was still running, did not result in any of the harms against which the *Ex Post Facto* Clause was intended to protect, does not fall into any of the four categories of *ex post facto* laws identified in *Calder,* and is constitutional according to the apparently unanimous authority from other jurisdictions. *Cf. Stogner,* 539 U.S. at 620–21, 123 S.Ct. 2446.

We conclude that the extension of the statute of limitations for sexual abuse effected by the Felony Sexual Assault Act, as applied to the prosecution of appellant for the 2000 offense, did not violate the *Ex Post Facto* Clause.

## III. Joinder and Severance

Appellant argues that the two counts of sexual abuse were improperly joined under Rule 8(a), and, even if they were properly joined, their joinder in a single trial caused him undue prejudice. Thus, he argues, the trial court should have granted his motion to sever the two counts. "Rule 8(a) governs the initial joinder of offenses in an indictment where there is a single defendant.... Rule 14, in contrast, governs situations where the offenses are properly joined under Rule 8, but where the potential prejudice from joinder is sufficiently great that severance is nonetheless justified." *Roper v. United States,* 564 A.2d 726, 728 n. 3 (D.C.1989).

### A. Joinder under Rule 8(a)

■ Rule 8(a) provides that:

Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors, or both, are of the same or similar character or are based on the same act or transaction or on 2 or more acts or transactions connected together or constituting parts of a common scheme or plan.

---

man, 275 N.Y.S. at 62; *accord State v. Skakel,* 276 Conn. 633, 888 A.2d 985, 1028 (2006); *Hamel,* 643 A.2d at 955 ("Subject to constitutional qualifications, 'statutes of limitation[s] may be changed at the pleasure of the legislative power,' *Willard v. Harvey,* 24 N.H. 344, 355 (N.H.1852), by 'reduc[ing] or enlarg[ing] the time within which the action must be prosecuted.' ") (quoting *Bourque v. Adams,* 93 N.H. 257, 40 A.2d 582, 584 (1945)); *see also*

*United States v. Thompson,* 98 U.S. 486, 489, 25 L.Ed. 194 (1878) ("The common law fixed no time as to the bringing of actions. Limitations derive their authority from statutes."); C. Torcia, Wharton's Criminal Law § 90, at 415 (1978). However, "[a]fterwards, it is a defense, not of grace, but of right, not contingent, but absolute and vested, and like other defenses not to be taken away by legislative enactment." *Reibman,* 275 N.Y.S. at 63.

Super. Ct.Crim. R. 8(a) (2001). We review a claim of misjoinder under Rule 8(a) *de novo. See Joyner v. United States*, 540 A.2d 457, 459 (D.C.1988).

▮▮▮ The two sexual abuse counts against appellant were joined as having been "of the same or similar character." In reviewing the joinder of two offenses on this ground, we have noted previously that "courts have largely relied on common-sense definitions of the term 'same or similar.'" *Roper*, 564 A.2d at 729. Under such a definition, "offenses are of the same or similar character where the counts in the indictment 'allege the same general kinds of crimes.'" *Id.* (quoting *Winestock v. United States*, 429 A.2d 519, 524 (D.C. 1981)). "When a pretrial motion claims misjoinder of . . . offenses, the court ordinarily determines the motion on the basis of the indictment alone." *Winestock*, 429 A.2d at 524 (internal quotation marks and citation omitted). "[I]f the indictment charges two or more 'similar' offenses, then these offenses are properly joined." *Id.* In this case, the offenses in the indictment are not only alike, but identical. Thus, there was no improper joinder under Rule 8(a).

### B. *Severance under Rule 14*

Rule 14 provides, in relevant part, that:

If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires. . . .

Super. Ct.Crim. R. 14 (2001).

▮▮▮ "In the District of Columbia, joint trial of offenses properly joined is favored because it 'expedites the administration of justice, reduces the congestion of trial dockets, conserves judicial time, lessens the burdens upon citizens who must sacrifice both time and money to serve upon juries, and avoids the necessity of recalling witnesses who would otherwise be called upon to testify only once.'" *Arnold v. United States*, 511 A.2d 399, 404 (D.C. 1986) (footnote omitted) (quoting *Parker v. United States*, 404 F.2d 1193, 1196 (9th Cir.1968)). Therefore, we have "consistently recognized a presumption in favor of joinder of offenses of a similar character to conserve state funds, limit inconvenience, and avoid delay." *Robinson v. United States*, 452 A.2d 354, 358 (D.C.1982).

▮▮▮ The standard of review for the denial of a motion under Rule 14 is well settled:

A motion for severance on the ground of prejudicial joinder is committed to the sound discretion of the trial court. This court will therefore reverse the denial of a motion to sever under [Rule 14] only upon a clear showing of an abuse of that discretion. To meet this burden, the defendant must show the most compelling prejudice from which the court would be unable to afford protection if both offenses were tried together. . . . It is not sufficient to show that the defendant would have a better chance of acquittal if the charges were tried separately.

*Parker v. United States*, 751 A.2d 943, 947 (D.C.2000) (internal quotation marks and citations omitted). Because of the potential for prejudice in cases where the offenses have been joined under Rule 8(a) as having been "of the same or similar character," however, the trial court should grant a Rule 14 motion to sever "'unless (1) the evidence as to each offense is separate and distinct, and thus unlikely to be amalgamated in the jury's mind into a single inculpatory mass, or (2) the evidence

of each of the joined crimes would be admissible at the separate trial of the others.'" *Id.* (quoting *Bright v. United States,* 698 A.2d 450, 454 (D.C.1997)). The trial court denied appellant's Rule 14 motion on the ground that evidence of the two crimes could be presented separately and distinctly.[5]

When reviewing the denial of Rule 14 motions to sever, we have looked favorably upon efforts by the government to present evidence of different crimes separately. *See Arnold,* 511 A.2d at 405 (noting that "the government was careful to keep the evidence of the two crimes separate" and "argued the case to the jury as two separate and distinct occurrences, first reviewing the evidence relating to one and then the evidence relating to the other"); *Reyes v. United States,* 933 A.2d 785, 794 (D.C. 2007) (noting that the prosecutor "was careful to keep the evidence presented at trial regarding [one offense] separate from the other [offenses]"); *cf. Cox v. United States,* 498 A.2d 231, 236 (D.C.1985) (holding that the failure to sever two joined rape offenses was improper where "the conduct of the trial here did not scrupulously prevent the overlap of the charges .... [t]he prosecutor suggested similarities between the two rapes throughout his opening statement and closing arguments."); *Drew v. United States,* 331 F.2d 85, 92–94 (D.C.Cir.1964). We have also considered whether the trial court explicitly instructed the jury to consider the joined crimes separately. *See Reyes,* 933 A.2d at 795 (noting that instructions informed the jury "that it was to give separate consideration and return separate verdicts with respect to each count of the indictment" and that "a finding of guilty on one count did not necessarily require a finding of guilty on any other counts") (internal quotation marks omitted); *Arnold,* 511 A.2d at 405 ("The trial court instructed the jury, both at the beginning of the trial and in its final charge, that the two robberies must be viewed as separate and distinct incidents."). "Given the danger that the jury might infer guilt from a defendant's criminal disposition or might be disposed to convict because of hostility to the defendant, both court and counsel must conduct the trial with a 'vigilant precision in speech and action far beyond that required in the ordinary trial.'" *Cox,* 498 A.2d at 235 (quoting *Drew,* 331 F.2d at 94). We find that this high standard was met in appellant's trial.

█ The record shows that the evidence for each of the two assaults was kept separate and distinct. As noted by the trial court in denying the motion to sever, appellant's trial involved assaults of two different women, at separate locations, that occurred over five years apart. Factually, therefore, the evidence was different as to each. The court and the parties took care to ensure that evidence of the offenses was presented separately: the court's preliminary instructions to the jury and the opening statement of the prosecutor emphasized that the charges and the evidence as to each charge were to be

---

**5.** Prior to trial, counsel for appellant informed the court that appellant intended to use a defense of consent for the 2000 incident and to deny that the 2005 incident occurred. At trial, however, he changed strategies and relied on a defense of consent for both counts. In light of the common defense of consent, the government argues in its brief that severance was not required because evidence of each incident would have been admissible in the trial of the other, to show appellant's assaultive intent. The government also argues that even if the counts should have been severed, any error in failing to do so was harmless. Because we perceive no abuse of discretion in the trial court's reason for denying appellant's pretrial motion to sever the counts, we do not reach the further arguments raised by the government.

considered separately; the entirety of the case for the 2000 assault was presented before the prosecutor shifted and presented the entirety of the case for the 2005 assault; the government called two separate DNA experts, one for each assault; during closing argument, the prosecutor summarized the evidence as to each charge separately; defense counsel stressed in closing argument that the jury was to consider the evidence as to each charge separately; the prosecutor reemphasized in rebuttal argument that the jury was to consider the evidence with respect to each count separately; and the final instructions to the jury underlined the separateness of the charges, and noted that the jury could find the defendant guilty of neither crime, just one crime, or both crimes.

Appellant cites three examples where he claims the evidence as to the two crimes was presented in such a way that the jury is likely to have amalgamated it. Two of these incidents occurred during the cross-examination of appellant. During his testimony, appellant asserted that both sexual encounters had been consensual, alleging that one had been a money-for-sex transaction and that the other had been a drugs-for-sex transaction. At one point, the prosecutor asked appellant about the plausibility of appellant's claim that the 2000 incident had been consensual, and then asked appellant about his claim that he often bought sex for money or drugs in 2005. Later in the cross-examination, the prosecutor impeached appellant with the fact that he had initially denied having sexual intercourse with either complainant when he was questioned by the police in 2008. Finally, in closing argument, the prosecutor noted that appellant had admit-

ted to engaging (or attempting to engage) in intercourse with both victims. These questions and comments strike us as inevitable in a single trial against a defendant who raises a defense of consent to both crimes. They did not impermissibly amalgamate the evidence "'into a single inculpatory mass,'" *Parker*, 751 A.2d at 947 (quoting *Bright*, 698 A.2d at 454), nor did they "confound[ ]" or "embarrass" appellant's defense, *Drew*, 331 F.2d at 92. The separate presentation of the evidence, the distinct arguments, and the jury instructions adequately protected appellant's interest in having the jury focus on each offense separately, without undue prejudice from a trial of two counts involving the same offense. Thus, there was no abuse of discretion in denying the motion to sever the two counts.

## IV. Ineffective Assistance of Counsel

Appellant's final claim on appeal is that the trial court erred in denying his motion to vacate his sentence under D.C.Code § 23–110, for ineffective assistance of counsel. In his motion, appellant argued that his trial counsel had been ineffective for failing to present "a medical expert to serve as rebuttal evidence against the government's witnesses and their ability to recall due to their state of mind as crack cocaine users." Appellant argues that an expert witness would have undermined the credibility of the complaining witnesses, both of whom were drug-users,[6] and that the failure to call an expert deprived appellant of a fair trial. The trial court denied the motion without a hearing.

 The resolution of a § 23–110 motion requires a hearing "[u]nless the motion and files and records of the case conclusively show that the prisoner is enti-

---

**6.** A.M.H. testified that she was not "using crack cocaine" on the night in question and had been "clean" for ten months prior to the incident on November 29, 2005. She conceded that she had relapsed six months before appellant's trial.

tled to no relief." D.C.Code § 23–110(c). "[W]here the court is faced with a claim of ineffective assistance of counsel, ... [§ 23–110(c) ] creates a presumption that a hearing should be held, especially where the allegations of ineffectiveness relate to facts outside the trial record." *Hollis v. United States*, 623 A.2d 1229, 1232 (D.C. 1993) (citations omitted). However, "[a]t the same time, we recognize the superior vantage point of the trial judge from which 'to determine whether there is any appreciable possibility that a hearing could establish either constitutionally defective representation or prejudice to the defendant in the *Strickland* sense.' " *Id.* at 1232–33 (quoting *Sykes v. United States*, 585 A.2d 1335, 1340 (D.C.1991)). The burden is on appellant "adequately to allege facts which, if demonstrated, would establish ineffective assistance of counsel." *Johnson v. United States*, 385 A.2d 742, 744 (D.C.1978) (footnote citation omitted). However, "a hearing is unnecessary when the motion contains only '(1) vague and conclusory allegations, (2) palpably incredible claims, or (3) allegations that would merit no relief even if true.' " *Lane v. United States*, 737 A.2d 541, 548–49 (D.C. 1999) (quoting *Dobson v. United States*, 711 A.2d 78, 83 (D.C.1998)). The denial of a § 23–110 motion is reviewed for abuse of discretion. *Id.* at 548.

■■■■ In order to succeed on a claim of ineffective assistance of counsel, the appellant "must show (1) deficient performance by his trial counsel, and (2) prejudice traceable to his trial counsel's deficiencies." *Zanders v. United States*, 678 A.2d 556, 569 (D.C.1996). To show deficient performance, appellant must demonstrate "that his 'counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment.' " *Id.* (quoting *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). As to prejudice, appellant must show " 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *Id.* (quoting *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052).

■■■■ The trial court denied appellant's motion, concluding that appellant would not be able to meet either prong of the *Strickland* test. The court noted that (1) "[a] reasonably competent criminal defense attorney, on the facts of this case, would not have attempted to present the kind of expert testimony proffered vaguely in defendant's motion"; (2) "had the attorney offered such testimony, the court would have excluded it"; and (3) "for a variety of reasons, even if the court had allowed such testimony, it would have made no difference in the outcome of the trial." Without addressing the other grounds relied upon by the trial court,[7] we affirm the denial of appellant's motion because he would not have been able to show that his trial counsel's conduct caused substantial prejudice.

Appellant argues that an expert witness could have undermined the credibility of the victims' recollections of the assaults by bringing to light their past drug use and the effect of such drug use on their

---

7. We do note, however, that appellant neither identified his proffered expert witness or the expert's relevant qualifications, nor explained exactly what kind of testimony an expert would have given. Such a skeletal proffer of expert testimony may well have been too "vague and conclusory," *Lane*, 737 A.2d at 549, so as to justify denial without a hearing on this ground alone. *See Strozier v. United States*, 991 A.2d 778, 786 (D.C.2010) (rejecting an ineffective assistance of counsel claim in a § 23–110 motion "because [appellant] did not submit with his motion a statement, declaration, or affidavit of the potential [expert] witness setting forth in detail what his testimony would have been").

memory. He premises this argument upon the assertion that "the complainants' recollections were a crucial factor in the government's case-in-chief." We disagree. Appellant admitted to having sexual encounters with both women and his DNA was matched to semen found on each one. At issue in the trial was consent, not identification or some other detail subject to the fallibilities of memory—appellant's defense as to each count was that the complainant was lying because she was biased, not that she didn't remember the incident correctly. Whether or not drug use might have had some effect on the complainants' perception or memory, appellant has not alleged how this could have had any bearing on whether the jury believed his defense of consent.

Moreover, the jury was well aware of the complainants' long history of drug use. Defense counsel brought out at trial that C.M. had used crack-cocaine and heroin for twenty-one years, that she had been on the way to shoplift goods that she could sell for drug money on the day of the assault, and that at the time she testified in appellant's trial, she was serving a sentence for distribution of cocaine. It was also revealed that A.M.H. had a long history of drug use and that she had prior criminal convictions for drug possession, drug distribution, and prostitution. Defense counsel was able to impeach both witnesses' credibility using this evidence during cross-examination.

In light of the evidence presented at trial, which included testimony and medical reports that both women had fresh injuries after their sexual encounters with appellant, and the impeachment of the complainants with their drug use and convictions, appellant cannot make a showing of prejudice resulting from counsel's failure to call an expert to testify at appellant's trial " 'sufficient to undermine confidence in the outcome' " of his trial. *Zanders,* 678 A.2d at 569 (quoting *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052).

The judgment of conviction is

*Affirmed.*